Sandra HICKMON v. Randy HICKMON

CA 99-1300                                    19 S.W.3d 624

Court of Appeals of Arkansas
Division III
Opinion delivered June 21, 2000

*Cuffman & Phillips*, by: *James H. Phillips*, for appellant.

*Glover Law Firm*, by: *David M. Glover*, for appellee.

ANDREE LAYTON ROAF, Judge. Sandra Hickmon appeals an order from the Saline County Chancery Court denying her petition for permission to move out of state with her seven-

year-old daughter Miranda. Sandra had primary physical custody of the child and shared joint legal custody with her ex-husband, appellee Randy Hickmon. Since her divorce from Randy, Sandra had remarried and wanted to join her new husband in Phoenix, Arizona. Sandra's sole point on appeal is that the chancellor used an incorrect legal standard in deciding the merits of her petition. We affirm.

On May 16, 1996, Sandra and Randy were divorced after just over ten years of marriage. By agreement of the parties, "joint custody" of their only child, Miranda, was ordered. Pursuant to that agreement, Sandra had primary physical custody and Randy had extensive visitation.

On August 21, 1997, Randy moved to modify the decree, seeking joint physical custody, to include additional time with Miranda. Sandra opposed the motion and filed a counter-petition alleging that Randy had not cooperated with her regarding decisions concerning Miranda's welfare, asked for sole custody, and requested, in light of the fact that she had become engaged to be married to a resident of Phoenix, Arizona, that she be allowed to take Miranda with her to Phoenix. Randy then amended his motion to seek sole physical custody. By order entered October 28, 1997, the chancellor denied both parties' petitions.

On June 15, 1998, Sandra again petitioned for permission to move Miranda to Phoenix, stating that she had now married Dr. Alex McLaren. Randy again counter-petitioned for sole physical custody. The chancellor subsequently ordered the parties to make themselves available to psychologists Dr. Paul Deyoub and Dr. Margarita Garcia, experts retained respectively by Sandra and Randy. Both psychologists submitted reports.

In his report dated January 25, 1999, Dr. Deyoub stated that he interviewed Sandra, Randy, both stepparents, and Miranda. He stated that although Sandra was very depressed in January of 1997, two years had elapsed and she genuinely appeared to be in remission. Nonetheless, Dr. Deyoub stated that he had concerns about moving Miranda to Phoenix. He noted that "there will be a price to pay for this." Dr. Deyoub stated that if Miranda moved, by the time she was twelve, her formerly close relationship with Randy will be a "distant and possibly unretrievable memory." He opined

that while the move was in Sandra's best interest, it was not in the best interest of preserving Miranda's relationship with her father, and more to the point, it was in Miranda's best interest to remain in Arkansas with her mother to preserve her relationship with her father. According to Dr. Deyoub, Sandra told him that she would not move to Phoenix if it would jeopardize her retaining primary physical custody of Miranda. He also agreed with Sandra that Randy seems to "over do it" with Miranda, and stated that except for a small increase in visitation for Randy, the status quo should be maintained.

In a subsequent evidentiary deposition on April 30, 1999, Dr. Deyoub reiterated his conclusion that Sandra's depression was not currently a problem. He, however, did not retreat from the opinion that the proposed move to Phoenix would cause "some loss" in Miranda's relationship with her father, even if Sandra flew Miranda back for visits every other weekend. He opined that it was "better for the child" if Miranda was able to maintain the relationship that she "now has with her father." Dr. Deyoub noted that Sandra "has had her problems in the past," and opined that it "changed this whole situation a little bit," and accordingly, it "skewed a little bit more in the father's favor, in terms of maintaining that parental involvement." He also opined that Sandra's desire to make the move to Phoenix was in part inspired by her desire to get away from Randy and noted that Sandra expressed concern about Miranda's step-mother attempting to assume her role. Dr. Deyoub reiterated his concerns with the proposed move and stated, "if you only look at what Miranda needs, then I think she should stay here." He further stated that this conclusion was based on the level of involvement that Randy had in Miranda's life, and would not necessarily have the same opinion if Randy's involvement were only "peripheral."

Two documents authored by Dr. Garcia were entered into evidence. The first was a report, dated November 2, 1998, that was based on a series of office visits with Randy, his wife Devina, and Miranda. The report states that "Miranda is established in her community, she has family in Arkansas, friends at school, horses and other animals she dearly loves in her father's backyard," and has "a positive relationship with her father." Dr. Garcia opined, "Miranda's need for a stable childhood outweighs the mother's need to uproot her from Arkansas to Arizona. Miranda would have to

deal with more loss (i.e., her father, her home, her pets, her friends and teacher) which is unnecessary since Miranda has a very capable and devoted father who has succeeded in creating a stable home for her." A second report, dated February 4, 1999, which stated that it was based on sessions with Miranda and Sandra, was also made part of the record. It noted that Miranda's stated desire to stay in Arkansas or move with her mother to Arizona "shifted depending upon which parent she felt she needed to please on that particular visit." Nonetheless, Dr. Garcia found both Randy and Sandra to be "better than adequate" parents, and in part because Sandra "made it clear" that she will not move to Arizona without Miranda, "maintaining the minor child's current joint custody in Arkansas is in Miranda's best interest."

Also made part of the record was a deposition of Dr. George Hamilton, Sandra's treating psychiatrist, taken on September 11, 1998. In it he stated that Sandra's diagnosis was that of "Major Depressive Disorder, Recurrent, In remission."

A full hearing on the petitions was held on June 24, 1999. Sandra testified that she has had primary physical custody of Miranda since the divorce. She claimed that she married Dr. McLaren, an orthopedic surgeon in Phoenix, a year ago, and that it was very hard to be away from her new husband in a long-distance marriage. Sandra stated that she had a home there and a job lined up as research coordinator in orthopedics that would be better than her current job at the University of Arkansas Medical Center in that it would give her more pay, require that she work fewer hours, and allow her to do some of her work at home. She stated that it would not be practical for her husband to move to Little Rock. Sandra also expressed resentment about Randy's new wife Devina "trying to supplant" her role as Miranda's mother, and the intrusiveness of Randy's involvement with his daughter, particularly the frequency of his phone calls. She also expressed dissatisfaction with Randy's taking Miranda to Dr. Garcia. Sandra opined that she had previously been denied permission to move Miranda because of her depression, but stated that she was better now. She conceded that Randy and Miranda "are close," and she noted that Randy volunteered at Miranda's school and served as Miranda's soccer coach. Sandra also testified that she would fly with Miranda back to Little Rock every other weekend at her expense to enable Randy to maintain regular visitation, if the move were allowed.

Sandra's new husband Dr. McLaren testified that he was an orthopedic surgeon, but worked as chief of orthopedics and the director of the orthopedic training program at the Americorp Medical Center because a shoulder injury prevented him from actively treating patients. He stated that this disability prevented him from simply moving to Little Rock as there would not be a comparable position available. Dr. McLaren testified that he owned a nice but "modest home by a lot of professional standards" in Phoenix, and had two children, ages twelve and fourteen, that visit him from time to time and got along "very well" with Miranda when they met her.

Randy testified that he would withdraw his change of custody petition if Miranda stayed in Arkansas. He claimed that he always enjoyed a close relationship with Miranda. Randy stated that he was her soccer coach and regularly volunteered at her school. According to Randy, he tries to go to her school at least twice a week, to have lunch with her and talk to her teachers. Randy asserted that Miranda was also close to his parents and visits with them often, "about every other time we have her." He stated that Miranda loves animals, so he bought her a dog, a cat, and a pony. He claimed that he has constantly asked for more time with Miranda, for opportunity to help raise her, and to be involved in every aspect of her life and "not just a visitor." He generally denied Sandra's allegations that he was overly intrusive in seeking contact with Miranda.

At the close of all the testimony, the chancellor announced from the bench that he was denying Sandra's petition to take Miranda to Arizona. He noted that both experts stated that it was not in Miranda's best interest to leave the state, and was particularly impressed by Dr. Deyoub's methodology and conclusions.

On appeal, Sandra argues that the chancellor used an incorrect legal standard in deciding the merits of the custodial parent's petition to relocate out of state with the parties' minor child[1] In this regard, Sandra contends that the chancellor erred in only considering the best interest of the child and not applying the guidance set forth in *Staab v. Hurst*, 44 Ark. App. 128, 868 S.W.2d 517 (1994).

---

[1] We note that although the parties had "joint custody" by agreement, Sandra clearly had primary physical custody of Miranda, and consequently, this case should be analyzed as a request by the custodial parent to relocate and not as a change of custody.

She asks that this court reverse and remand for further proceedings in which the chancellor would apply the *Staab* factors in determining whether she should be allowed to move Miranda out of state. In the alternative, Sandra prays that this court apply the *Staab* factors on *de novo* review, which she contends will weigh in favor of her being allowed to move away with Miranda. This argument is without merit.

■■ This court reviews chancery cases *de novo* and reverses the findings of the chancellor only if his findings are clearly against the preponderance of the evidence. *Wilson v. Wilson,* 67 Ark. App. 48, 991 S.W.2d 647 (1999). In deciding which parent should have custody of a child and what is in the best interest of the child, the chancellor has the burden of evaluating the witnesses and their testimony. *Id.*

■■ Contrary to what Sandra suggests, *Staab* did not abolish the best-interest-of-the-child standard in cases where a custodial parent wishes to move a child out of state. As this court stated in *Staab*:

> While we agree with the chancellor that achieving the "best interests of the child" remains the ultimate objective in resolving all child custody and related matters, we believe that the standard must be more specific and instructive to address relocation disputes. In particular, we think it important to note that determining a child's best interests in the context of a relocation dispute requires consideration of issues that are not necessarily the same as in custody cases or more ordinary visitation cases.

44 Ark. App. at 133, 868 S.W.2d at 519. This court merely provided more guidance for chancellors when they are confronted with this situation. *Id., see also Wilson v. Wilson, supra.* In the instant case, there is no indication that the chancellor decided this case in a manner that was inconsistent with this court's holding in *Staab*. We note further that Sandra did not, in accordance with Rule 52 of the Arkansas Rules of Civil Procedure, request specific findings of fact on the *Staab* factors. Accordingly, this case is analogous to *Mega Life & Health Ins. Co. v. Jocola,* 330 Ark. 261, 954 S.W.2d 898 (1997), where the supreme court held that the failure to ask for such findings constitutes a waiver of this issue on appeal. Therefore, Sandra's prayer for further proceedings is procedurally barred.

■ However, because this court's review is *de novo*, we must still address Sandra's argument on the merits to determine if the trial court's ruling was clearly erroneous. In *Staab v. Hurst, supra,* this court set forth five factors that should be "included" in determining whether to allow a custodial parent to remove a child from the state. These factors are:

> (1) the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children; (2) the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the non-custodial parent; (3) whether the custodial parent is likely to comply with substitute visitation orders; (4) the integrity of the non-custodial parent's motives in resisting the removal; and (5) whether, if removal is allowed, there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parent relationship with the non-custodial parent.

*Id.* Before a chancellor is to consider the *Staab* factors, the custodial parent bears the threshold burden to prove some real advantage to the children and himself or herself in the move. *Wilson v. Wilson, supra.*

On the threshold question, Sandra argues that it has been "proved" because she is now married to an orthopedic surgeon who owns his own home, has other children who get along with Miranda, and has secured her a position that would "maximize" the time she could spend at home with Miranda. We do not agree that a real advantage to Miranda is proven by these facts.

Obviously, the move would have significant advantages for Sandra; she would be with her husband and she would be away from her ex-husband, whom she perceives as an antagonist in her life. Although the evidence was somewhat sparse in this regard, she also would apparently be moving to a better-paying job, requiring fewer hours, and the flexibility to work at home. However, it is not apparent that there would be any "real advantage" for Miranda.

■ Significantly, both Dr. Deyoub and Dr. Garcia only perceived the move to Phoenix as inflicting yet another "loss" on Miranda. Not only would she have lesser contact with her father, she would also lose contact with friends, teammates, extended

family, pets, her teacher, and familiar home surroundings. Furthermore, in the instant case, we do not have a firmly rooted new family arrangement that is simply moving away. *Cf. Friedrich v. Bevis*, 69 Ark. App. 56, 9 S.W.3d 556 (2000). Sandra herself will be adjusting to life with a new husband. Finally, regarding the new family arrangement, although Sandra spoke of Dr. McLaren's children as providing an advantage to Miranda, given the disparity of her age and theirs, and the testimony that they visit "from time to time," it is not readily apparent how their potential relationship with Miranda would constitute an advantage for her.

We cannot say that there is compelling evidence of improper motive on Sandra's part in wanting to move, or Randy's part in opposing it; that any visitation order would not be complied with; or that the visitation Sandra offered would not be substantial. Nonetheless, we have before us a case in which Miranda's father is highly involved in her life, to her obvious advantage, and a paucity of evidence of any real advantage for Miranda in moving to Phoenix. Significantly, both experts opined that the move was not in Miranda's best interest. Under these circumstances, we cannot say that the chancellor's decision was clearly erroneous.

Affirmed.

CRABTREE and KOONCE, JJ., agree.