229 N.J. Super. 520 (1989)
552 A.2d 194
LINDA S. MURNANE, PLAINTIFF-APPELLANT,
v.
DENNIS J. MURNANE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 15, 1988.
Decided January 4, 1989.
*522 Before Judges ANTELL, DREIER and BROCHIN.
Gebhardt & Kiefer, attorneys for appellant (William W. Goodwin, Jr., on the brief).
Anthony P. D'Alessio, attorney for respondent (Anthony P. D'Alessio, on the brief).
The opinion of the court was delivered by BROCHIN, J.S.C. (temporarily assigned).
Plaintiff, Linda Scott Murnane, and defendant, Dennis J. Murnane, were divorced by a judgment which provided that the parties would have joint custody of their only child, Andre, who was born February 28, 1982, that "primary residential custody" would remain with Andre's mother and that she "would not remove the child from the residence in Stroudsburg, Pennsylvania without the consent of the defendant except to move into the State of New Jersey...." The judgment also provided that Ms. Murnane would resume her maiden name, Scott, and we will refer to her as Ms. Scott in this opinion.
Plaintiff and defendant were married November 21, 1981. They were permanently separated in January 1985 after a prior separation and a failed reconciliation. They were divorced *523 January 15, 1988. Ms. Scott appeals from the judgment of divorce insofar as it prohibits her from moving with Andre to her parents' home in Orlando, Florida.
At the time of the hearing before the trial court, Ms. Scott was 33 years old. From the age of two until she was 25, she lived in Orlando, Florida. From there she moved to New York City where she lived for two and a half years, and then moved to Watchung, New Jersey, with Mr. Murnane. They lived in Watchung for about eight months and then moved to Califon, New Jersey, where they resided until their final separation in January 1985. By agreement, Ms. Scott then moved with Andre to a rural area on the outskirts of Stroudsburg, Pennsylvania, where she lives in an old rented farmhouse, sharing the house with an elderly woman who is either the owner or another tenant. Ms. Scott has no relatives in New Jersey or Pennsylvania. The record does not contain any evidence of what friends or other source of emotional support or practical assistance she has in the area.
Mr. Murnane, who now lives in Califon, lived most of his life in Springfield, New Jersey. His father still lives there and one sister and her husband live in Morristown. Mr. Murnane is employed as a cable maintenance man for New Jersey Bell Telephone Company. By agreement, he takes his son for visitation every weekend from approximately noon on Saturday until Sunday evening and spends vacations with him. During the weekend visits, Andre stays in Mr. Murnane's home in Califon.
Ms. Scott is employed as a waitress and, part time, as a ballet teacher. Her take home pay is about $175 a week.
After an extended period of career counseling, Ms. Scott decided that she wanted to improve her economic situation by making a career in the field of hospitality management. She learned, however, that in order to gain entry to that field at anything other than the lowest level, she needed additional college study and a degree. However, if there is no one *524 available to help her with the care of her son and she is required to continue to work at two jobs in order to support herself, she feels that she will be unable to attend college.
Ms. Scott's parents have an ample home in a middle class neighborhood in Orlando, Florida, in which there is sufficient room for her and Andre. There is a university nearby which offers the courses which she is seeking, and her parents have offered to let her and Andre live with them, rent free, while she is pursuing her education. She is confident that when she has received her degree, she will be readily able to find appropriate employment in the Orlando area which, of course, is the site of Disneyworld and of numerous other attractions for business and vacation visitors. Furthermore, according to Ms. Scott, wages are higher in Orlando than in East Stroudsburg and the cost of living is about the same. For these reasons, Ms. Scott sought sole custody of Andre and authorization to move with her son to Orlando, Florida.
Mr. Murnane opposed his wife's application to move to Florida with Andre. Both parties agree that Mr. Murnane is dedicated to his son, that he is a good father, and that they have a good relationship. Because Mr. Murnane works late during the week, he and Andre have been able to spend time together on a regular basis only on weekends. These regular weekly visits would, of course, be impossible if Mr. Murnane continued to live in New Jersey and Andre lived in Florida. Furthermore, Mr. Murnane contends, visits for longer periods would be difficult because he gets only one week's vacation during the summer and because of the expense of air transportation between New Jersey and Florida, particularly while Andre is too young to fly unaccompanied.
Because of Mr. Murnane's concerns about his inability to afford the air fare for trips between Florida and New Jersey, the parties agreed on the record that if Ms. Scott was permitted to move to Florida with Andre, child support would be reduced. If she and Andre live in this area, Mr. Murnane is to pay $300 a *525 month child support and to continue monthly payments for her automobile and automobile insurance; when the car is paid for, child support payments are to be increased to $525 per month and Mr. Murnane will be entitled to claim Andre as a dependent for tax purposes. If Ms. Scott is permitted to move to Florida with Andre, support payments will be $300 per month, there will be no other payments, and Ms. Scott will be entitled to claim Andre as a dependent.
The trial judge found that a move to Florida might have "a real advantage" for Ms. Scott. He recognized that her financial situation would improve, that the availability of her parents as caretakers for the child would facilitate her pursuing the education which she desires and that she probably has friends in the Orlando, Florida area. He also conceded her good faith in desiring to make the move.
However the trial court concluded that the potential advantages of the move to Ms. Scott would be limited. He found that although Orlando, Florida, was an area in which the hospitality management field was growing, East Stroudsbourg was also a resort area and educational opportunities comparable to those which she sought were also available in a local college there. The advantage to Ms. Scott of having her parents available to help with Andre's care was somewhat balanced, in the court's view, by the fact that Mr. Murnane's sister and brother-in-law live in Morristown, New Jersey and were available to provide day care for Andre if necessary. There was no testimony about the state of Ms. Scott's relations with her divorced husband's family.
The court noted that Ms. Scott had offered insufficient evidence to show the adequacy of the educational facilities which would be available to Andre in Florida. Ms. Scott contemplated that Andre would attend the public elementary school to which she had gone as a child, but the court objected that she did not know what the class size was and that she had not actually made a direct investigation into "what the schooling might be *526 down there." Consequently, the school situation was, for the judge, "an unknown that I don't feel comfortable in projecting a child into."
Finally, the court concluded that the detrimental effect which the move would have upon Andre's relationship with his father outweighed any advantages of the move to Ms. Scott and, through her, to Andre. The court concluded that Andre, who was then five years old, would be unable to travel unaccompanied between New Jersey and Florida until he was at least seven. Therefore the court assumed that any visitation would require an adult's accompanying Andre from Florida to New Jersey, returning alone to Florida, coming back to New Jersey to retrieve Andre and returning with him to Orlando. On that basis, the court calculated that the transportation costs would be approximately $900 for the three round trips required for a single visit. Consequently, the court found, particularly while Ms. Scott was pursuing her education rather than working full time, it would not be possible to establish "a realistic and reasonable visitation schedule under the proofs" presented to the court.
As her first ground of appeal, Ms. Scott attacks the trial court's exercise of jurisdiction over the custody, visitation and related child care issues in the case. She contends that under N.J.S.A. 2A:34-28, the jurisdictional section of New Jersey's version of the Uniform Child Custody Jurisdiction Act, Pennsylvania is the State with jurisdiction over those issues.
We agree with the trial court that it possessed and properly exercised jurisdiction over the custody issues in this case. First of all, Ms. Scott, who now challenges the jurisdiction of the court to adjudicate custody, is the party who initiated the divorce action in this State, based upon Mr. Murnane's domicile here. Determination of the custody of the children of divorced parents has always been an important incident of a divorce suit. We do not believe that the purpose or effect of the Uniform Child Custody Jurisdiction Act was to require that issues of child custody be severed from the other *527 issues involved in a divorce action where, as in this case, the non-domiciliary party who has consensual custody of a child has instituted a divorce action in this State based upon the bona fide domicile of the other party. Such an interpretation of the statute would be inconsistent with the legislative finding set forth in N.J.S.A. 2A:34-29 that the act was necessary to "avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well being...." Rather, such an interpretation would promote precisely the competition and conflict which the Uniform Child Custody Jurisdiction Act was intended to avoid.
Furthermore, even if jurisdiction is available only in accordance with the literal terms of the Act, the trial court has jurisdiction in this case. According to N.J.S.A. 2A:34-31a:
The Superior Court of the State of New Jersey has jurisdiction to make a child custody determination by initial or modification decree if: ....
(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships....
In the present case, Mr. Murnane clearly has a significant connection with the State. Andre's connection is also significant because he resided here from the time he was born, February 28, 1982, until January 1985. He regularly spends weekends here with his father. He visits his aunt and uncle here and he has a grandfather living in New Jersey. Substantial evidence concerning Andre's present or future care, protection, training and personal relationships are available in this State and were presented to the court by the testimony of his father and his father's sister and brother-in-law. Consequently, the jurisdictional provisions of N.J.S.A. 2A:34-31 were fully complied with.
Ms. Scott also challenges the prohibition against her moving to Florida with Andre on the ground that N.J.S.A. *528 9:2-2, the statute upon which the prohibition is based, is unconstitutional insofar as it infringes upon her fundamental right of interstate travel. She is correct, of course, that the right to travel is constitutionally protected. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). But the Constitution does not prohibit a state from imposing some legal consequences on a person's entering or leaving the jurisdiction. See E.G. Starns v. Malkerson, 326 F. Supp. 234 (D.C.Minn. 1970), aff'd 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971) (durational residency requirement for lower tuition upheld); Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (durational residency requirement for divorce upheld).
In a case such as the present one, the State has a strong interest in properly adjudicating custody in order to assure the welfare of a minor. If the two parties claiming custody each proposes to live in a different jurisdiction, the court is bound to take that fact into consideration. If the court has adjudicated custody on the assumption of residence within New Jersey so as to protect, among other things, the visitation rights of the noncustodial parent and the interest of the child in maintaining a close relationship with that parent, the court must necessarily have the right to prevent the custodial parent from thereafter moving the child to a location whose distance would thwart the interests of the child and of the noncustodial parent. Thus interpreted, there is no constitutional defect in N.J.S.A. 9:2-2. Cf. Holder v. Polanski, 111 N.J. 344 (1988); Cooper v. Cooper, 99 N.J. 42 (1984).
The substantial question before this court, however, is whether the trial court properly applied N.J.S.A. 9:2-2 in the light of Holder v. Polanski, supra, an opinion which had not yet been rendered when the trial court decided the custody issue in this matter. That statute, insofar as pertinent, states:
When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced ..., and such children are natives of *529 this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction ... unless the court, upon cause shown, shall otherwise order.
Cooper v. Cooper, 99 N.J. 42 (1984), upon which the trial court relied, established guidelines to be followed when the custodial parent seeks permission to remove the children from the State of New Jersey. Holder summarizes those guidelines as follows:
Under Cooper, `the custodial parent initially must show that there is a real advantage to that parent in the move and that the move is not inimical to the best interests of the children.' Ibid. Once the custodial parent has made this threshold showing, courts must then consider three factors: the prospective advantages of the move, including its capacity for maintaining or improving the general quality of life of both the custodial parent and the children; the integrity of the custodial parent's motives in seeking to move, as well as the noncustodial parent's motives in seeking to restrain the move; and whether a realistic and reasonable visitation schedule can be reached if the move is allowed. Id. at 56-57 [Holder 111 N.J. at 350.]
Holder v. Polanski, 111 N.J. 344 (1988), modified these guidelines. Holder proceeds from the premise of the legal equality of men and women. Holder states:
Formerly, custody of children of tender years was generally awarded to the mother. With increasing frequency, however, mothers and fathers now share the responsibility for the care and custody of their children and the support of the family. Consequently, courts have begun to make more frequent awards of custody to fathers and, in appropriate cases, to make joint custody awards. Nonetheless, in many instances, the mother still receives custody of the children, and the father is awarded visitation rights. Implicit in that arrangement is the right of the father to move elsewhere for virtually any reason. [citation omitted] As men and women approach parity, the question arises when a custodial mother wants to move from one state to another, why not? [at 349, emphasis supplied]
Cf. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).
The Holder court modified the rule of Cooper by holding that "any sincere, good faith reason will suffice, and that a custodial parent need not establish a `real advantage' from the move." Id. 111 N.J. at 352-353. The former wife's "motivation... to live closer to her relatives and to make a fresh start in life ... clearly was a sufficient explanation to justify her move...." Id. at 353. Accordingly, once the trial court finds "that the custodial parent wants to move for a good-faith reason, it *530 should then consider whether the move will be inimical to the best interest of the children or adversely affect the visitation rights of the noncustodial parent." Id. at 352-353. If, as in the present case, "the move will require substantial changes in the visitation schedule, proofs concerning the prospective advantages of the move, integrity of the motives of the party and the development of a reasonable visitation schedule remain important." Id. at 353. The focus of the inquiry should "not be on whether the children or the custodial parent will benefit from the move, but on whether the children will suffer from it." Id. at 353. Finally, the court admonishes, "Maintenance of a reasonable visitation schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of a custodial parent to move. In resolving the tension between a custodial parent's right to move and a noncustodial parent's visitation rights, the beacon remains the best interest of the children." Id. at 353-354.
Holder cites Cooper for the proofs which should be considered in connection with "the development of a reasonable visitation schedule." On that issue, the following holding from Cooper retains its authority:
Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child. [Cooper, 99 N.J. at 57-58
The Holder decision, requires us to remand this matter to the trial court. Ms. Scott has clearly established a bona fide reason for the move which she desires to make. Since "the move will require substantial changes in the visitation schedule", Holder 111 N.J. at 353, the court should consider whether "in our mobile society, it may be possible to honor [the noncustodial parent's visitation] schedule and still recognize the right of a custodial parent to move." Ibid. In making that determination, the court should take into consideration that Mr. Murnane's *531 support payments would be reduced by $225 a month or $2700 a year if Ms. Scott and Andre moved to Florida. Presumably, all or part of that money would be available to finance the cost of transportation. Ms. Scott should have the opportunity to offer detailed, concrete evidence, if she can, of some practical way to maintain the relationship between her son and former husband if she moves to Florida.
However, Mr. Murnane, as the noncustodial parent, will have the burden of coming forward "with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child." Cooper 99 N.J. at 57-58 Furthermore, in view of the Holder court's emphasis on the parity of men and women, in seeking to determine whether the move can be made without substantial detriment to Andre's interests and Mr. Murnane's visitation rights, the trial court should also weigh the burden which Mr. Murnane would suffer if he is forced to relocate in order to remain close to Andre against the burden which Ms. Scott will have to bear if she is forced to remain in East Stroudsburg in order to retain custody.
We reverse and remand for further proceedings in accordance with this opinion.