770 A.2d 214

CARITA L. BAURES, PLAINTIFF–APPELLANT, v. STEVEN
R. LEWIS, DEFENDANT–RESPONDENT.

Argued January 17, 2001—Decided April 23, 2001.

92

*Veronica M. Davis*, argued the cause for appellant, (*Lomurro, Davison, Eastman & Munoz*, attorneys; *Cheryl K. Brunner*, on the brief).

*Barbara L. Birdsall*, argued the cause for respondent, (*Stout & O'Hagan*, attorneys).

The opinion of the court was delivered by

LONG, J.

Ideally, after a divorce, parents cooperate and remain in close proximity to each other to provide access and succor to their children. But that ideal is not always the reality. In our global economy, relocation for employment purposes is common. On a personal level, people remarry and move away. Noncustodial parents may relocate to pursue other interests regardless of the strength of the bond they have developed with their children.

Custodial parents may do so only with the consent of the former spouse. Otherwise, a court application is required.

Inevitably, upon objection by a noncustodial parent, there is a clash between the custodial parent's interest in self-determination and the noncustodial parent's interest in the companionship of the child. There is rarely an easy answer or even an entirely satisfactory one when a noncustodial parent objects. If the removal is denied, the custodial parent may be embittered by the assault on his or her autonomy. If it is granted, the noncustodial parent may live with the abiding belief that his or her connection to the child has been lost forever.

Courts throughout the country, grappling with the issue of relocation, have not developed a uniform approach. Ann M. Driscoll, Note, *In Search of a Standard: Resolving the Relocation Problem in New York,* 26 *Hofstra L.Rev.* 175, 176 (1997). Some use a presumption against removal as their point of departure; others use a presumption in favor of removal; still others presume nothing, but rely on a classic best-interests analysis. *Id.* at 178.

We have struggled to accommodate the interests of parents and children in a removal situation in our prior cases. *Holder v. Polanski,* 111 *N.J.* 344, 544 *A.*2d 852 (1988); *Cooper v. Cooper,* 99 *N.J.* 42, 491 *A.*2d 606 (1984). In so doing, we have developed something of a hybrid scheme. Although it is not based upon a presumption in favor of the custodial parent, it does recognize the identity of the interests of the custodial parent and the child, and, as a result, accords particular respect to the custodial parent's right to seek happiness and fulfillment. At the same time, it emphasizes the importance of the noncustodial parent's relationship with the child by guaranteeing regular communication and contact of a nature and quality to sustain that relationship. Further, it incorporates a variation on a best interests analysis by requiring proof that the child will not suffer from the move.

We revisit the issue in this appeal, not only to resolve the matter before us, but because of what we perceive as confusion among the bench, Bar, and litigants over the legal standards that

should apply in addressing a removal application, and particularly over what role visitation plays in the calculus.

## I

Carita Baures (Baures), a native of Wisconsin married Steven Lewis (Lewis), a native of Iowa and an officer in the United States Navy, on October 5, 1985, in Rothschild, Wisconsin. Their only child, Jeremy, was born on June 24, 1990. During the marriage, the couple lived in the various locations in which the Navy billeted them. In 1994, they moved to New Jersey when Lewis was stationed in Leonardo.

At age two, Jeremy began to exhibit developmental difficulties. By 1994, Jeremy, then aged four, was diagnosed with Pervasive Developmental Disorder (PDD), a form of autism.[1] Over the next few years, through trial and error, the parents arranged an effective therapeutic and educational regimen for Jeremy through a combination of public school and the Douglass College Outreach Program.

In 1995, recognizing that their financial resources were being taxed to the limit, Baures and Lewis discussed moving to Wisconsin. Baures' parents live in Wisconsin and are retired school teachers who offered to help care for Jeremy while Baures and Lewis worked. According to both parties, the couple planned to move to Wisconsin after Lewis was discharged from the Navy in 1998. In anticipation of the discharge, Baures' parents sold their home in Schofield, Wisconsin and moved to Galesville because, according to them, it was a short distance to the Chileda Institute

---

[1] PDD is a lifelong disability and patients suffering from this disorder have difficulty with language and social communication. *The American Heritage Stedman's Medical Dictionary* 627 (1995). A cause has not been identified, but current research suggests that autism is caused by a biochemical or neurological disorder of the brain. Jeremy exhibits the following characteristics of autism: speech problems; repetition of what he hears; little interest in playing with others; no interest in being cuddled or touched; limited interest in activities; insistence on following strict routines; prone to tantrums.

(Chileda), a Program for autistic children. Lewis flew to Wisconsin to research job opportunities.

In 1996, escalating marital discord brought the case to court. Lewis sought custody of Jeremy because he believed that Baures was going to remove the child to Wisconsin. One day before the hearing, Baures filed a complaint for divorce alleging extreme cruelty. In response to Lewis's application for custody, Baures denied that she had any intention of moving Jeremy out of New Jersey. The parties then entered into a consent order that provided for custody and visitation and restrained both parties from leaving New Jersey with Jeremy. Baures and Lewis separated in late 1996. In April 1997, Baures filed an amended complaint for divorce requesting permission to relocate to Wisconsin. A three-day trial was held to resolve the issue.

At trial, Baures claimed that she should be allowed to relocate to Wisconsin because the parties had limited funds and could no longer afford to live in New Jersey without the help of her parents. Without a vehicle (Lewis had taken the family car), Baures had no way to get Jeremy to his special programming or to his doctors. Moreover, because Jeremy is a child with special needs, he could not be admitted to regular day care. Baures testified that in Wisconsin, her parents would be able to provide child care and shelter for her and Jeremy so that she could work.

Although Baures holds a master's degree in human resources management that she obtained in 1989, she never worked in that field and has held only part-time cleaning and baby-sitting jobs since Jeremy was born. She attempted to find more suitable employment but, of the twenty-four jobs in her field that she researched, Baures testified that none was able to provide child care for Jeremy because of his special needs.

In June of 1996, Baures' parents came to New Jersey to help her care for Jeremy and remained for over a year after Lewis took Baures' name off the checkbook, credit cards and savings account, and denied her the use of the automobile. In that time, Baures' father transported Jeremy to and from his programming,

and provided additional child care. In total, Baures' parents paid her in excess of one-thousand dollars per month to supplement the court ordered child support she received in the amount of one-hundred dollars per week.

Baures testified that the Chileda Institute offers outreach programming to children who have been diagnosed with autism or PDD. The program is similar to the Douglas Program in that it provides trained professional therapy for the child at home. Chileda is located within twenty minutes of Baures' parents' house. Baures inquired whether Jeremy would be eligible for services at Chileda and faxed the school Jeremy's diagnostic materials and other documentation. A representative of Chileda responded that, based on the materials she had received, Jeremy would be eligible. She could not, however, say specifically what programming would be provided until there was an accurate assessment of Jeremy to determine what approach should be incorporated into the home program. Baures conceded that, although her father visited Chileda, she never did so, and that what she knew about the program was elicited from telephone calls, literature, and her father's visit. Baures offered no information regarding what services are available in the Wisconsin public schools.

Baures acknowledged that Lewis should have ongoing contact with Jeremy. To encourage the relationship, she stated that Lewis could visit Jeremy one week a month and stay in her parents' basement free of charge. That offer was reiterated by Baures' father. In addition, Baures agreed to pay half of the transportation costs from New Jersey to Wisconsin if Lewis could obtain an economical rate.

On cross-examination, Baures testified that Lewis was a good father to Jeremy, and that his presence in Jeremy's life is important to the child's progress. Moreover, she acknowledged that in the initial action instituted by Lewis to prevent her from moving to Wisconsin, she had stated that if Jeremy was to leave the State of New Jersey, he would lose his relationship with his father and would be prevented from attending the Douglass

Program, the best available program, both of which would adversely affect his progress.

Joan Hurst, a coordinator at the Douglass Program, testified at trial on Baures' behalf. Hurst was offered and accepted as an expert in the field of autism and PDD. Hurst explained that a child with autism needs a highly structured, full-day program beyond normal school hours that teaches and applies behavior modification techniques throughout the day. Hurst explained that a strong family support system is important because:

[i]t's really the basis of the child's program. The school and the professionals can lay the foundation and show the family what to do, but it needs follow through in all areas of their lives. And since home is really the most common place for them and in their security and where they are most of the time, everything needs to continue when they come home from school. And it needs to continue to go on with the family at home.

When asked what a family member might have to do to continue home programming, Hurst went on:

every minute is a teaching minute ... especially with Jeremy having the diagnosis of autism, since language is such an issue, there should be constant modeling of language. There should be constant modeling of appropriate reactions to situations.... There should be constant teaching on how to successfully complete daily activities of the day. And constant teaching and modeling and prompting of what is normal and acceptable to society of things that we go through each day.

Hurst made several recommendations with respect to Jeremy that include the following: that any program for Jeremy must be highly structured and staffed by professionals experienced in the field of autism; have a low student/teacher ratio; provide appropriate peer models; operate on a twelve month basis; support the family; offer a trained professional to assist Jeremy as a shadow,[2] and provide speech therapy sessions as needed. She did not render an opinion regarding whether the Wisconsin public schools and Chileda could provide those services.

--------

[2] A "shadow" is a trained worker that follows the child around the classroom and encourages appropriate activities and responses. Hurst was one of Jeremy's shadows from February 1997 to the end of the school year.

At the time of the hearing, Lewis, who holds a bachelor's degree in economics, was employed in the United States Navy, and had been for over nineteen years. His rank was that of a chief petty officer, electronics technician. He indicated that his ultimate career goal is to be an electrical engineer, but that he will be required to take further courses. Further, he claimed, based on advertisements in the newspaper and talking with people in the area, Galesville, Wisconsin offered no jobs. He stated that he has no property or family in Wisconsin, however, his mother lives in Minnesota, about a five-hour distance from Wisconsin. At the time of the hearing, his visitation schedule was two afternoons a week from 4:30 p.m. until 7:30 p.m. and alternate weekends.

Lewis testified that his command would not let him travel to Wisconsin one week a month to visit his son. Regardless, he stressed that he could not visit at the Baures's house due to the estranged relationship with their daughter. Lewis stated that Jeremy will regress if he is separated from him for an extended period of time.

The trial court denied the removal. Although acknowledging that Baures had a good faith reason to move (financial and emotional stability and caregiving by her parents), the court held that the move would adversely affect Lewis' visitation with Jeremy; that Lewis could not visit regularly or relocate because of his Navy service; and that he does not have the financial resources to travel back and forth to Wisconsin. Further, the court held that Baures had not provided sufficient evidence that the educational opportunities for Jeremy in Wisconsin are comparable to that which he was receiving in New Jersey. Accordingly, the court held it was not in Jeremy's "best interests" to move to Wisconsin.

After being denied permission to remove Jeremy from New Jersey, Baures moved for reconsideration. The court entered a Judgment of Divorce in February 1998, and ordered a "best interests" evaluation by Dr. Amy Altenhaus. Although there was no issue as to custody, Dr. Altenhaus stated her opinion that it was in Jeremy's best interest that his mother continue as the

primary custodial parent. However, Altenhaus found that Baures and Lewis complemented each other's parenting styles. For example, Altenhaus observed that Baures attends to the everyday details of Jeremy's life, and is caring and supportive. In contrast, she found that Lewis wanted desperately for Jeremy to be "normal" and seemed "motivated to do whatever he can to help this boy be 'normal.' " Furthermore,

[w]hile [Mr. Lewis] may need to have a more realistic picture of what is possible for Jeremy, nonetheless his style with Jeremy is certainly important as well. Mr. Lewis gives Jeremy more room to explore and to do rough and tumble play. Mr. Lewis will take him places and let him explore more on his own without some of the structure that Ms. Baures imposes. While this structure is very important for Jeremy's acquisition of skills, it is also important that children like this have a chance to explore their environment in a less structured manner as well ... Jeremy clearly loves and enjoys being with both of his parents.

She stated that a move to Wisconsin "does not seem" to be in Jeremy's interest because Jeremy was doing well in East Brunswick, and because he would be unable to sustain a long distance relationship with his father who could not relocate because of his Navy commitments. Reconsideration was denied.

Lewis was discharged from the Navy on July 31, 1998. He found a full-time job in Edison as an electronics technician at a starting salary of $26,500, and a part-time job as a quality assurance tester for $9 an hour. As a result of Lewis' discharge, Baures requested the trial court to conduct a hearing on the issue of whether Lewis could relocate to Wisconsin pursuant to the requirements of *Rampolla v. Rampolla*, 269 *N.J.Super.* 300, 307–08, 635 *A.*2d 539 (App.Div.1993). *Rampolla* holds that in a removal case, the court should inquire about the capacity of the noncustodial parent to relocate as a method of ensuring the vitality of a shared custody arrangement. *Id.* at 307, 635 *A.*2d 539. Lewis testified that he had investigated job opportunities in Wisconsin, but had no success. He said that the jobs that were available in Galesville, a very small town, were not in his area of expertise and were low paying. He identified only two jobs that were commensurate with his skill level, but claimed that they were located in Milwaukee, a six-hour drive from Galesville. Lewis said

that he had considered working at IBM, located in nearby Rochester, Minnesota, but that he did not have the necessary digital electronics background or computer skills.

To counter Lewis's arguments, Baures offered the testimony of Arnold Gelfman, an employability and vocational expert from the Career Choice Institute of New Jersey. Gelfman testified in detail, concluding that Lewis had significant job opportunities as an electronics technician in Wisconsin and Minnesota at comparable or higher wages than in New Jersey and that the availability of such employment would increase at greater rates between 1994 and 2005 in Wisconsin and Minnesota than in New Jersey.

Lewis downplayed those statistics and said that they did not provide information about exactly where in Wisconsin and Minnesota those jobs could be found; did not identify any particular employer or industry in either state that had an immediate need for electronics' technicians; did not consider the fact that his expertise is limited to analog electronics; and did not recognize that not all electronics' technicians have the same skills. On cross-examination, Lewis acknowledged that his entire job search consisted of looking at classified ads on the Internet and that he never sent a letter or made a phone call to any potential employer in Wisconsin or went to that state to seek employment.

Based on the *Rampolla* hearing, and the testimony from the 1997 trial, the trial court affirmed its denial of Baures' motion. In so doing, the court stated that Baures was required to prove "the prospective advantages" of the move and that she had failed to do so. The court reaffirmed the conclusion that Baures' motion was made in good faith but noted that Jeremy is doing well in New Jersey; that the proximity of both parents is important to a special needs' child; and that there was insufficient evidence adduced to show that Lewis could obtain employment in Wisconsin at a location near Jeremy. Most importantly, in denying removal, the court relied on the fact that Baures did not provide adequate evidence of the comparability of educational and therapeutic facilities available to Jeremy in Wisconsin.

The Appellate Division affirmed the ruling in an unpublished decision. We granted certification. *Baures v. Lewis*, 165 *N.J.* 488, 758 *A.*2d 648 (2000).

## II

Historically, courts throughout the country have disfavored removal of a child from the jurisdiction after divorce. Edwin J. Terry et al., *Relocation: Moving Forward or Moving Backward?*, 31 *Tex. Tech. L.Rev.* 983, 986 (2000). Some courts continue to adhere to that view and apply a presumption against removal based on the notion that it will necessarily destroy the relationship between the noncustodial parent and the child. *See White v. White*, 437 *Pa.Super.* 446, 650 *A.*2d 110, 113 (1994)(requiring parent to demonstrate that move will significantly improve quality of life for parent and child before allowing removal); *McAlister v. Patterson*, 278 *S.C.* 481, 299 *S.E.*2d 322, 323 (1982)(announcing that presumption can be overcome only by showing relocation will benefit child).

Recently, however, many courts have reassessed the burden cast on custodial parents who desire to relocate with their children. Reasons for the change include the geographic mobility of the United States population and post-divorce demands. Chris Ford, *Untying the Relocation Knot: Recent Developments and a Model for Change*, 7 *Colum. J. Gender & L.* 1, 7 (1997). For example, within four years of separation and divorce about one-fourth of mothers with custody move to a new location. *Ibid.* In addition, one in five Americans overall changes his or her residence each year. *Ibid.*

That the ability to communicate over long distances has been revolutionized during the years since the first removal cases is also undeniable. Kelly M. Slavitt, *Gabby in Wonderland–Through the Internet Looking Glass*, 80 *J. Pat. & Trademark Off. Soc'y* 611, 611–12 (1998). Computers, technology and competitive long-distance rates, among other things, essentially have changed the way people connect with each other when they are apart. *Ibid.*

Most importantly, social science research links a positive outcome for children of divorce with the welfare of the primary custodian and the stability and happiness within that newly formed post-divorce household. *See* Judith S. Wallerstein & Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce*, 30 *Fam. L.Q.* 305, 311–12 (1996)(stating that psychological adjustment of custodial parent consistently has been found to be related to child's adjustment); Marsha Kline et al., *Children's Adjustment in Joint and Sole Custody Families*, 25 *Develop. Psych.* 430, 431 (1989)(noting that research indicates that factor associated with good outcomes for children in post-divorce families includes a close, sensitive relationship with a psychologically intact custodial parent). Justice Garibaldi touched on that in *Cooper* sixteen years ago when she said:

> [T]he child's quality of life and style of life are provided by the custodial parent. That the interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents. One researcher has concluded that [o]f all factors related to the child's way of coping with loss [of a parent because of divorce or death], the role of the home parent seemed most central. Some years after the divorce or death, the well-being of the child appeared closely related to the well-being of the [home]parent. [L. Tessman, *Children of Parting Parents* 516 (1978).]

> Other investigators have found that there is an increased emotional dependence on the custodial parent after divorce and that children of all ages 'were in trouble' when the home parent-child relationship was affected by stress on the home-parent, such as 'loneliness and discouragement.' J. Wallerstein & J. Kelly, *Surviving the Breakup* 114, 224–225 (1980).

> [*Cooper, supra*, 99 *N.J.* at 53–54, 491 *A.*2d 606.]

Since that time, social science research has uniformly confirmed the simple principle that, in general, what is good for the custodial parent is good for the child.

To be sure, the research also affirms the importance of a loving and supportive relationship between the noncustodial parent and the child. Frank F. Furstenberg & Andrew J. Cherlin, *Divided Families: What Happens to Children When Parents Part* 72 (1991); Michael E. Lamb, *Fathers and Child Development: An Integrative View of the Role of the Father in Child Development*

(rev. ed.1981); Janet R. Johnson, *Children's Adjustment in Sole Compared to Joint Custody Families and Principles for Custody Decision Making*, 33 *Fam. & Conciliation Cts. Rev.* 415, 419 (1995); Marsha Kline et al., *Children's Adjustment in Joint and Sole Custody Families*, 25 *Develop. Psych.* 430, 431 (1989). What it does not confirm is that there is any connection between the duration and frequency of visits and the quality of the relationship of the child and the noncustodial parent. Wallerstein, *supra*, 30 *Fam. L.Q.* at 312 ("There is no evidence in Dr. Wallerstein's work of many years, including the ten and fifteen year longitudinal study, or in that of any other research, that frequency of visiting or amount of time spent with the noncustodial parent over the child's entire growing-up years is significantly related to good outcome in the child or adolescent."); *see also* Frank F. Furstenberg & Andrew J. Cherlin, *Divided Families: What Happens to Children When Parents Part* 72 (1991)(noting no connection between frequency of noncustodial visits and good outcomes for child). Although confidence that he or she is loved and supported by both parents is crucial to the child's well-being after a divorce, no particular visitation configuration is necessary to foster that belief. *Ibid.* According to scholars, so long as the child has regular communication and contact with the noncustodial parent that is extensive enough to sustain their relationship, the child's interests are served. *Ibid.;* Judith S. Wallerstein et al., *The Unexpected Legacy of Divorce* 215(2000). In short, a happy, productive, supportive custodial household along with a loving, sustaining relationship with the noncustodial parent are what is necessary to the adjustment of a child of divorce. Eleanor E. Maccoby & Robert H. Mnookin, *Dividing the Child: Social and Legal Dilemmas of Custody* (1992); E. Mavis Hetherington et al., *Long–Term Effects of Divorce and Remarriage on the Adjustment of Children*, 24 *J. Amer. Acad. Child Psych.* 518, 518 (1985).

As a result of all those factors, many courts have significantly eased the burden on custodial parents in removal cases. *See In re Marriage of Francis,* 919 *P.*2d 776, 784 (Colo.1996)(creating presumption that custodial parent's choice to move children should

generally be allowed); *Sefkow v. Sefkow,* 427 *N.W.*2d 203, 214 (Minn.1988)(holding noncustodial parent has burden of showing move will endanger child or is meant to frustrate noncustodial parent's relationship with child); *Auge v. Auge,* 334 *N.W.*2d 393, 399 (Minn.1983)(holding custodial parent is presumptively entitled to relocate); *Fortin v. Fortin,* 500 *N.W.*2d 229, 233 (S.D.1993)(interpreting state statute as incorporating presumption for removal); *Taylor v. Taylor,* 849 *S.W.*2d 319, 332 (Tenn.1993)(creating strong presumption in favor of custodial parent); *Long v. Long,* 127 *Wis.*2d 521, 381 *N.W.*2d 350, 352 (1986)(holding removal permitted if custodial parent has good reason for moving).

The shift in relocation law is underscored in three fairly recent court decisions. Chris Ford, *Untying the Relocation Knot: Recent Developments and a Model For Change,* 7 *Colum. J. Gender & L.* 1, 17 (1997). In *Tropea v. Tropea,* 87 *N.Y.*2d 727, 642 *N.Y.S.*2d 575, 665 *N.E.*2d 145, 151 (1996), the New York Court of Appeals replaced the "exceptional circumstances" requirement with a general "best interests" test in relocation cases. Prior to *Tropea,* if a litigant could not prove exceptional circumstances justifying relocation, and the relocation would deprive the noncustodial parent of regular access, New York courts were compelled to deny the relocation request without considering the child's best interests. *Id.* at 149–50. *Tropea* changed direction and began a focus not on the needs and desires of the parents, but on the way those needs and desires relate to the child.

Likewise, in *In re Marriage of Burgess,* 13 *Cal.*4th 25, 51 *Cal.Rptr.*2d 444, 913 *P.*2d 473, 481 (1996), the California Supreme Court abandoned the prior hostile approach taken toward the custodial parent in relocation cases. The court rejected a rigid test that required a custodial parent to show a "necessity" for the move and said,

> the 'necessity' of relocating frequently has little, if any, substantive bearing on the suitability of a parent to retain the role of a custodial parent. A parent who has been the primary caretaker for minor children is ordinarily no less capable of maintaining the responsibilities and obligations of parenting simply by virtue of a reasonable decision to change his or her geographical location.

*[Id.* at 481.]

In place of the "necessity test," *Burgess* directed the lower courts to take into account the custodial parent's "presumptive right" to move.

The Colorado Supreme Court followed suit in *In re Marriage of Francis, supra,* 919 *P.*2d at 782. There, the custodial parent sought to move east to attend school. *Id.* at 778. The trial court ruled that if she enrolled in the school program, she would lose custody of her children. *Id.* at 779. The Colorado Supreme Court reversed and held that the child's interests are so interwoven with the new family unit that a court must consider the custodial parent's interests:

[W]e find that the child's best interests are served by preserving the custodial relationship, by avoiding relitigation of custody decisions, and by recognizing the close link between the best interests of the custodial parent and the best interest of the child. In a removal dispute, this leads logically to a presumption that the custodial parent's choice to move with the children should generally be allowed.

*[Id.* at 784.]

Those cases embody the growing trend in the law easing restrictions on the custodial parent's right to relocate with the children and recognizing the identity of interest of the custodial parent and child.

### III

An analysis of New Jersey's removal scheme begins with *N.J.S.A.* 9:2–2. That act provides:

When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order.

Several cases are instructive regarding the import of the "cause" provision of that statute. In *Cooper, supra,* 99 *N.J.* at 46, 491 *A.*2d 606, the trial court was faced with an application by a custodial parent (the mother) to move to California to take advantage of a business opportunity. Her former husband objected on

the basis that the reasons for the move were frivolous; that the children had a deep connection to his close-knit east coast family; and that he could not arrange blocks of time in his schedule to make his former wife's visitation proposal realistic. *Id.* at 48, 491 *A.2d* 606. The trial court allowed the move and the Appellate Division reversed. *Id.* at 49, 491 *A.2d* 606.

We granted certification and began our opinion by emphasizing that the purpose underlying *N.J.S.A.* 9:2–2 is

> to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship. This mutual right of the child and the noncustodial parent to develop and maintain their familial relationship is usually achieved by means of visitation between them. Because the removal of the child from the state may seriously affect the visitation rights of the noncustodial parent, the statute requires the custodial parent to show cause why the move should be permitted.
>
> [*Id.* at 50–51, 491 *A.2d* 606.]

However, citing *D'Onofrio v. D'Onofrio,* 144 *N.J.Super.* 200, 365 *A.2d* 27 (Ch.Div.), *aff'd o.b.,* 144 *N.J.Super.* 352, 365 *A.2d* 716 (App.Div.1976) and *Helentjaris v. Sudano,* 194 *N.J.Super.* 220, 476 *A.2d* 828 (App.Div.1984), we also recognized a countervailing interest:

> '[T]he family unity which is lost as a consequence of the divorce is lost irrevocably, and there is no point in judicial insistence on maintaining a wholly unrealistic simulation of unity.' [citations omitted]. The realities of the situation after divorce compel the realization that the child's quality of life and style of life are provided by the custodial parent. That the interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents.
>
> [*Cooper, supra,* 99 *N.J.* at 53–54, 491 *A.2d* 606.]

We further stated that

> [t]he custodial parent who bears the burden and responsibility for the child is entitled, to the greatest possible extent, to the same freedom to seek a better life for herself or himself and the children as enjoyed by the noncustodial parent.
>
> [*Id.* at 55, 491 *A.2d* 606.]

By those acknowledgments, we identified a fundamental tension that exists in a removal case: the interests of the custodial parent in self-governance are pitted against the interests of the noncustodial parent in maintaining his or her relationship with the child.

Against that backdrop, we went on to set forth the methodology to be utilized in a removal case:

When removal is challenged under *N.J.S.A.* 9:2–2, we hold that to establish sufficient cause for the removal, the custodial parent initially must show that there is a real advantage to that parent in the move and that the move is not inimical to the best interests of the children.... It is only after the custodial parent establishes these threshold requirements that the court should consider, based on evidence presented by both parties, visitation and other factors to determine whether the custodial parent has sufficient cause to permit removal under the statute....

\* \* \*

The first factor to be considered is the prospective advantages of the move in terms of its likely capacity for either maintaining or improving the general quality of life of both the custodial parent and the children. The second factor is the integrity of both the custodial parent's motives in seeking to move and the noncustodial parent's motives in seeking to restrain such a move (e.g., whether the custodial parent is motivated by a desire to defeat and frustrate the noncustodial parent's visitation rights and remove himself or herself from future visitation orders or whether the noncustodial parent is contesting the move mainly to impede the custodial parent's plans or to secure a financial advantage with respect to future support payments). And the third factor is whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be reached if the move is allowed. In a given case, evidence of any of these factors may be used to militate against either the threshold showing of the custodial parent for removal, or the arguments of the noncustodial parent against removal.

\* \* \*

Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child.

[*Id.* at 56–58, 491 *A.*2d 606.]

In *Cooper*, we specifically noted that the advantages of the move should not be sacrificed solely to maintain the "same" visitation schedule where a reasonable alternative visitation scheme is available and the advantages of the move are substantial.

Four years later, we revisited the issue of removal. In *Holder, supra*, 111 *N.J.* at 347, 544 *A.*2d 852, the custodial parent (a mother) requested permission from the trial court to allow her to

move to Connecticut because she wanted to live near family members who could provide her with emotional and financial support, she had a job offer in Connecticut and also planned to attend college there. *Ibid.* The trial court denied the mother's request because she failed to make the threshold showing that there was a "real advantage" to the move. *Id.* at 351, 544 *A.2d* 852. Specifically, the court held that she failed to establish that the cost of living was lower in Connecticut or that superior housing, educational opportunities, job opportunities, or child care were available there. *Ibid.* Thus, even though the move was not inimical to the best interests of the children, the trial court held that the personal satisfaction and emotional support for the custodial parent were not enough to satisfy the "real advantage" test. *Ibid.* The Appellate Division affirmed. *Ibid.*

We granted certification and began our analysis by underscoring what we had recognized in *Cooper*—that after divorce, the family unit is forever altered and that it is the reality of that changed family structure that must be accounted for in a removal case. *Id.* at 349, 544 *A.2d* 852. Focusing on the liberty interests of custodial parents and the fundamental inequity that emerges out of a scheme that holds a custodial parent in this state while allowing a noncustodial parent complete freedom of movement, we said:

> As men and women approach parity, the question arises when a custodial mother wants to move from one state to another, why not? Until today, our response has included the requirement that the custodial parent establish, among other things, a real advantage to that parent from the move. *Cooper v. Cooper,* 99 *N.J.* 42, 56, 491 *A.2d* 606 (1984). We now modify that requirement and hold that a custodial parent may move with the children of the marriage to another state as long as the move does not interfere with the best interests of the children or the visitation rights of the noncustodial parent.
>
> [*Id.* at 349, 544 *A.2d* 852.]

More particularly, we revisited *Cooper* and held that "any sincere, good-faith reason will suffice," and that a custodial parent need not establish a "real advantage from the move." *Id.* at 352–53, 544 *A.2d* 852.

Motives are relevant, but if the custodial parent is acting in good faith and not to frustrate the noncustodial parent's visitation rights, that should suffice. Maintenance of a reasonable visitation schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of a custodial parent to move. In resolving the tension between a custodial parent's right to move and a noncustodial parent's visitation rights, the beacon remains the best interests of the children.

[*Id.* at 353–54, 544 *A.*2d 852.]

That modification recognized that, because the real advantage test was too great a burden, the *Cooper* calculus had failed in its intent to allow custodial parents the same freedom enjoyed by noncustodial parents to seek a better life. Expressing the *Cooper* standard in *Holder* terms, removal should not be denied solely to maintain the same visitation schedule where a reasonable alternative visitation scheme is available and there are good faith reasons for the move.

Under *Holder* it is not any effect on visitation, but an adverse effect that is pivotal. 111 *N.J.* at 352, 544 *A.*2d 852. An adverse effect is not a mere change or even a lessening of visitation; it is a change in visitation that will not allow the noncustodial parent to maintain his or her relationship with the child. Such a change implicates what *Holder* describes as a best interest analysis, although not the classic one: "The emphasis ... should be not on whether the children or the custodial parent will benefit from the move, but on whether the children will suffer from it." *Id.* at 353, 544 *A.*2d 852. Implicit in that aspect of *Holder* is the notion that a visitation schedule that will not maintain the relationship of the noncustodial parent and the child would cause the child to suffer.

It would be fair to say that together *Cooper* and *Holder* elucidated the general philosophy underpinning the removal scheme of *N.J.S.A.* 9:2–2. It is equally fair to say that those decisions left open questions. For example, although the cases following *Cooper* and *Holder* are clear about the custodial parent's burden of proving good faith, they are unclear and at variance regarding the burden of going forward, the ultimate burden of proof, and the elements of the burden in determining whether the move would be inimical to the interests of the child.

That is particularly true when visitation is the nub of the noncustodial parent's objection. Thus, *Cerminara v. Cerminara*, 286 *N.J.Super.* 448, 669 *A.*2d 837 (App.Div.1996), *Winer v. Winer* 241 *N.J.Super.* 510, 575 *A.*2d 518 (App.Div.1990), and *Murnane v. Murnane*, 229 *N.J.Super.* 520, 552 *A.*2d 194 (App.Div.1989), all declared that it is the burden of the custodial parent to prove a good faith reason for the move. However, *Murnane* then added to the custodial parent's burden the obligation to "offer evidence" of a practical alternative visitation schedule and held that the noncustodial parent has the burden of "coming forward" with evidence that the proposed schedule would be unworkable and would "adversely affect" his relationship with the child. *Murnane, supra*, 229 *N.J.Super.* at 531, 552 *A.*2d 194.

In *Winer*, a different panel of the Appellate Division held that once the party seeking removal establishes a good faith reason for the move, "[t]he burden remains with the noncustodial parent *to prove* that as a result of relocation, *visitation will be affected in a way that will prove harmful to the child[ren]*." *Winer, supra*, 241 *N.J.Super.* at 518, 575 *A.*2d 518 (emphasis added).

In *Cerminara*, the court set forth the scheme this way:

Under the *Holder* test, 'a custodial parent may move with the children of the marriage to another state as long as the move does not interfere with the best interests of the children or the visitation rights of the noncustodial parent.' *Id.* at 349, 544 *A.*2d 852. *All the custodial parent need establish is that he or she has a 'good-faith reason' for making the move. Id.* at 353, 544 *A.*2d 852. In short, absent 'an adverse effect on the noncustodial parent's visitation rights or other aspects of a child's best interests, the custodial parent should enjoy the same freedom of movement as the noncustodial parent.' *Id.* at 352, 544 *A.*2d 852.

[*Cerminara, supra*, 286 *N.J.Super.* at 454–55, 669 *A.*2d 837 (emphasis added).]

Again, although each of the cited decisions is clear regarding the burden of the party seeking removal to prove a good faith reason, a clear paradigm for trying a removal case cannot be distilled from them, especially when a change in visitation is the crux of the objection advanced by the noncustodial parent.

Roiling the waters, *McMahon v. McMahon*, 256 *N.J.Super.* 524, 528, 607 *A.*2d 696 (Ch.Div.1991) has held that the *Cooper/Holder* removal scheme applies in a joint physical custody situation while

*Voit v. Voit,* 317 *N.J.Super.* 103, 106, 721 *A.*2d 317 (Ch.Div.1998), has held that it does not. *See also Chen v. Heller,* 334 *N.J.Super.* 361, 378–79, 759 *A.*2d 873 (App.Div.2000)(upholding the *Voit* analysis). Further, at least one commentator writing on the subject of removal in New Jersey has characterized our cases as creating a "rebuttable presumption" in favor of relocation. Carol S. Bruce & Janet M. Bowermaster, *The Relocation of Children and Custodial Parents: Public Policy Past and Present,* 30 *Fam. L.Q.* 245, 283 (1996). Our task is to clarify those matters.

## *IV*

█ In order to describe the template for a removal case, some preliminary observations are in order. A removal case is entirely different from an initial custody determination. When initial custody is decided, either by judicial ruling or by settlement, the ultimate judgment is squarely dependent on what is in the child's best interests. *N.J.S.A.* 9:2–4; *see Kinsella v. Kinsella,* 150 *N.J.* 276, 317, 696 *A.*2d 556 (1997) (stating that in custody determination "the primary and overarching consideration is the best interest of the child"); *Fantony v. Fantony,* 21 *N.J.* 525, 536, 122 *A.*2d 593 (1956)("Our law in a cause involving the custody of a minor child is that the paramount consideration is the safety, happiness, physical, mental and moral welfare of the child."). Whoever can better advance the child's interests will be awarded the status of custodial parent.

█ Removal is quite different. In a removal case, the parents' interests take on importance. However, although the parties often do not seem to realize it, the conflict in a removal case is not purely between the parents' needs and desires. Rather, it is a conflict based on the extent to which those needs and desires can be viewed as intertwined with the child's interests. *Cooper,* and more particularly, *Holder,* recognize that subtlety by according special respect to the liberty interests of the custodial parent to seek happiness and fulfillment because that parent's happiness and fulfillment enure to the child's benefit in the new family unit.

At the same time those cases underscore the importance of the child's relationship with the noncustodial parent and require a visitation schedule sufficient to support and nurture that relationship. The critical path to a removal disposition therefore is not necessarily the one that satisfies one parent or even splits the difference between the parents, but the one that will not cause detriment to the child.

One final important point is that the *Cooper/Holder* scheme is entirely inapplicable to a case in which the noncustodial parent shares physical custody either *de facto* or *de jure* or exercises the bulk of custodial responsibilities due to the incapacity of the custodial parent or by formal or informal agreement. In those circumstances, the removal application effectively constitutes a motion for a change in custody and will be governed initially by a changed circumstances inquiry and ultimately by a simple best interests analysis. *Chen, supra,* 334 *N.J.Super.* at 381–82, 759 *A.2d* 873. Obviously then, the preliminary question in any case in which a parent seeks to relocate with a child is whether it is a removal case or whether by virtue of the arrangement between the parties, it is actually a motion for a change in custody.

## V

With those principles in mind, in assessing whether to order removal, the court should look to the following factors relevant to the plaintiff's burden of proving good faith and that the move will not be inimical to the child's interest: (1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the

noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new location; (9) if the child is of age, his or her preference; (10) whether the child is entering his or her senior year in high school at which point he or she should generally not be moved until graduation without his or her consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.

Obviously not all factors will be relevant and of equal weight in every case. For example, in a case in which the parties have no extended family in either location, that factor will not be considered. Likewise, when the children are not of the age of reason, consent will not come into play. Contrariwise, if the focus of the challenge to removal is the inadequacy of the out-of-state health or educational facilities, that factor will take on greater significance. It is likely that the main objection that will be lodged by the majority of noncustodial parents will be the change in the visitation structure thus; that will be the primary factor for consideration in most cases.

■ Again, a mere change, even a reduction, in the noncustodial parent's visitation is not an independent basis on which to deny removal. It is one important consideration relevant to the question of whether a child's interest will be impaired, although not the only one. It is not the alteration in the visitation schedule that is the focus of the inquiry. Indeed, alterations in the visitation scheme when one party moves are inevitable and acceptable. If that were not the case, removal could never occur and what *Cooper* and *Holder* attempted to achieve would be illusory.

■ We reiterate, however, the importance of mutual efforts to develop an alternative visitation scheme that can bridge the physical divide between the noncustodial parent and the child. By mutual is meant that the noncustodial parent is not free to reject every scheme offered by the custodial parent without advancing

other suggestions. Innovative technology should be considered where applicable, along with traditional visitation initiatives. In many cases, vacations, holidays, school breaks, daily phone calls, and E-mail, for example, may sustain a parent-child relationship as well as alternate weekends. No set scheme can ever guarantee a relationship. What is necessary is that communication and visitation is extensive enough to maintain and nurture the connection between the noncustodial parent and the child.

## VI

That said, the template for a removal case becomes clearer. As we have indicated, under *Cooper* and *Holder,* the moving party ultimately bears a two-pronged burden of proving a good faith reason for the move and that the child will not suffer from it.

In terms of the burden of going forward, the party seeking to move, who has had an opportunity to contemplate the issues, should initially produce evidence to establish *prima facie* that (1) there is a good faith reason for the move and (2) that the move will not be inimical to the child's interests. Included within that *prima facie* case should be a visitation proposal. By *prima facie* is meant evidence that, if unrebutted, would sustain a judgment in the proponent's favor.

The initial burden of the moving party is not a particularly onerous one. It will be met, for example, by a custodial parent who shows that he is seeking to move closer to a large extended family that can help him raise his child; that the child will have educational, health and leisure opportunities at least equal to that which is available here, and that he has thought out a visitation schedule that will allow the child to maintain his or her relationship with the noncustodial parent. If, for some reason, the custodial parent fails to produce evidence on the issues to which we have referred, the noncustodial parent will have no duty to go forward and a judgment denying removal should be entered.

Once that *prima facie* case has been adduced, however, the burden of going forward devolves upon the noncustodial parent who must produce evidence opposing the move as either not in good faith or inimical to the child's interest. She might, for example, challenge the move as pretextual and show that the custodial parent's past actions reveal a desire to stymie her relationship with the child, thus bearing on good faith. She might also offer proof that the move will take the child away from a large extended family that is a mainstay in the child's life. Alternatively, she could adduce evidence that educational, avocational or health care available in the new location are inadequate for the child's particular needs. She might also proffer evidence that because of her work schedule, neither relocation nor reasonable visitation is possible, and that those circumstances will cause the child to suffer. Where visitation is the issue, in order to defeat the custodial parent's proofs, the burden is on the noncustodial parent to produce evidence, not just that the visitation will change, but that the change will negatively affect the child.

Indeed, there are powerful visitation related issues that can defeat a removal application. For example, if the child has an emotional disorder and the noncustodial parent has provided a needed safety net, the impact of a move, with concomitant irregularity in visitation, might well cause the child to suffer. Likewise, as in this case, the proofs may reveal that because of the child's developmental disorder, a change in visitation will be harmful. But a child need not be ill or disabled for removal to cause harm because of diminished visitation. For example, if the child has a particular talent or skill, a noncustodial parent who has driven him or her to early and late practices, assisted the teacher or coach, organized road trips, attended competitions, and is the constant support in the child's dedication to the talent, can advance a persuasive argument that the inability to fulfill that role and pursue that connection with the child will be the kind of harm that should tip the scales against removal.

Although children are generally resilient and can adapt to removal so long as their relationship with the noncustodial parent is fully sustained through a new visitation scheme, the noncustodial parent remains free to adduce evidence that for particular reasons, and in light of the unique facts surrounding his or her relationship with the child, such a conclusion should not be drawn. The possible evidential proffers in a case like this are as varied as human nature itself.

It goes without saying that a noncustodial parent who is lackadaisical or sporadic in his or her visitation ordinarily will be unable to prevail in a removal case. That is not by way of retaliation for past inadequacies but because he or she will not be able to show that particularized harm will occur from removal.

After the noncustodial parent has gone forward, the moving party may rest or adduce additional evidence regarding the noncustodial parent's motives, the visitation scheme or any other matter bearing on the application. The trial court must then apply the burden of proof and the standards to which we have previously adverted.

### VII

As we have indicated, in order for Baures to prevail on her removal application the trial judge must be satisfied that she has a good faith reason for the move and that Jeremy will not suffer from it. Because there was confusion at trial over the details of the standard, and because, with the passage of time, the evidence adduced in the earlier proceedings may have changed, we reverse and remand for further proceedings consistent with this opinion.

Plainly Baures met the burden of establishing that she has a good faith reason for the move—the help and support of her parents. Further she has offered Lewis financial and logistical help to ameliorate visitation problems. However, she fell short in adducing sufficient evidence of the comparability of the special education program available in Wisconsin's public schools and

private agencies. Jeremy has a serious developmental disorder. Fine tuning a program for him is not an easy task. Indeed the program coordinator from Douglass, an expert in the field of PDD who testified on Baures' behalf, made a number of specific recommendations at the hearing regarding what kind of a full-day program is necessary for Jeremy. She did not address Chileda nor did she comment on Wisconsin's public school program.[3] Baures needs to produce evidence of the comparability of Wisconsin's public and private accommodations and that Jeremy will be accepted and not just placed on a wait list. The best program in the world is of no value if access is lacking.

Further, the record does not contain any specific information regarding Jeremy's current level of PDD including projections for improvement or current programming. The most recent information available is child study team evaluations conducted in 1997 by the East Brunswick public school system. Jeremy's level of functioning is directly related to the programming issue. If his functioning is very low and unlikely to change, the considerations regarding comparability of program would be entirely different than if he was functioning at a high level and continuing to make progress.

Assuming that Baures is able to adduce that proof, then Lewis may produce evidence about the particularized harm that would occur to Jeremy if removal is allowed. He may challenge the comparability of accommodations for Jeremy in Wisconsin. In terms of visitation, he may offer evidence that because of his disorder, Jeremy needs his regular visitation with Lewis, that Jeremy is incapable of maintaining any long distance relationship, that Jeremy's incapacity precludes meaningful computer, telephonic and written communication, and that other modes of communication cannot compensate for loss of visitation. On that

[3] Under the Individuals with Disabilities Education Act (IDEA), 20 *U.S.C.* § 1400, handicapped children are entitled to a free and appropriate education. New Jersey has complied with this mandate, *N.J.S.A.* 18A:46–19.1, as has Wisconsin, *Wis. Stat. Ann.* § 115.81 (West 2001).

score, expert testimony will likely be required. Baures may counter with an expert of her own on all the aforementioned issues, and because Jeremy's deficit is at least in part in the nature of an attachment disorder, on the question of whether he would suffer less than the average child if his visitation with his father became irregular.

■  If sporadic visitation with Lewis would be problematic for Jeremy, Lewis's ability to relocate with his family to Wisconsin becomes a question.  As far as the record reveals, his connections with New Jersey are tenuous at best, and he should produce evidence regarding his capacity to move.  We note that the evidence he adduced at the *Rampolla* hearing was entirely inadequate to sustain his position that he could not obtain employment in Wisconsin.  Indeed, he made no legitimate effort to seek employment there.  That of course is not the sole determinant. *Rampolla* itself recognizes that relocation by the noncustodial parent is likely to occur only in unusual cases.  We note, also, that Lewis failed to offer any evidence that his ties to New Jersey are such that he should not be viewed as able to relocate.  Finally, inquiry should be made regarding Baures' parents' willingness to remain with her in New Jersey.  To be sure they have no duty to do so.  But if they are amenable, that is a factor to be considered.

■  After all the evidence is in, in order to warrant removal, the trial court will have to be satisfied by a preponderance of credible evidence that Baures has proved a good faith reason to move and that Jeremy will not suffer therefrom.  The matter should be scheduled for trial expeditiously.

## VIII

In a removal case, the burden is on the custodial parent, who seeks to relocate, to prove two things: a good faith motive and that the move will not be inimical to the interests of the child. Visitation is not an independent prong of the standard, but an important element of proof on the ultimate issue of whether the child's interest will suffer from the move.

## IX

The judgment under review is reversed and the matter remanded for further proceedings consonant with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—none.