Sheree HOLLANDSWORTH v. Keith KNYZEWSKI

CA 01-982                                    79 S.W.3d 856

Court of Appeals of Arkansas
Divisions I, II, and IV
Opinion delivered July 3, 2002

*Andy E. Adams,* for appellant.

*Taylor Law Firm,* by: *Scott Smith* and *Chris D. Mitchell,* for appellee.

KAREN R. BAKER, Judge. Appellant Sheree Holland-sworth appeals the entry of an order by the Benton County Chancery Court that denied her request to relocate out of state with the children and changed custody from her to her ex-husband, appellee Keith Knyzewski. Sheree argues that the chancellor's decision is clearly erroneous. We agree and reverse and remand.

■ ■  A chancellor's decision is reviewed *de novo*, but the chancellor's findings will not be reversed unless they are clearly erroneous. *See Wagner v. Wagner*, 74 Ark. App. 135, 45 S.W.3d 852 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake was committed. *Id.* Under these facts, we are left with such a conviction.

The parties divorced on October 10, 2000. There were two children born of the marriage, Ethan, born February 1, 1996, and Katherine, born February 17, 1998. Pursuant to the divorce decree, Sheree had primary custody of the two children. Nonetheless, the parties, subsequent to the entry of the decree, agreed that each would have physical custody of the children one-half of the time until the oldest child entered kindergarten in the fall of 2001. Sheree remarried on December 31, 2000, and planned to relocate with the children to be with her new husband, Brian Hollandsworth, in Clarksville, Tennessee. On January 11, 2001, Keith filed a petition for a change of custody. Sheree filed a response asking for permission to relocate on January 17. The petitions were heard on April 26, 2001, and the judge entered an order granting a change of custody on May 21, 2001.

Keith lived in Rogers, Arkansas, with his parents. He worked nights, and was dependent upon his parents for the children's care and supervision. When asked whether he would facilitate visitation with Sheree's side of the family if he prevailed, Keith assured the chancellor that he would encourage it. However, he was concerned that if Sheree's petition to relocate was granted, the children might have to move from Clarksville eventually due to Brian's career in the military. He was also concerned that the children would be leaving their family and friends and would have to make new friends in Tennessee. Keith agreed that Sheree would be devastated if she could not move the children with her, as he would be if they were permitted to move away, but thought that the children's needs would be better served in northwest Arkansas.

Sheree and her new husband Brian were expecting a child in October 2001. Sheree had worked as a waitress in northwest Arkansas but, due to Brian's financial stability, she would have the opportunity to be a stay-at-home mother in Tennessee. She thought that the children would benefit from a two-parent household and the opportunity to have a relationship with their half-sibling. Sheree stated that Brian was a good step-parent and a good provider. She thought the children would be devastated if she were not permitted to take them. Both parties complimented the other on their parenting skills and on their ability to see to the children's needs.

The chancellor announced her findings at the conclusion of the hearing, finding that Sheree's petition should be denied, and Keith's petition should be granted. Her findings included: that Sheree had the threshold burden of showing some real advantage to herself and the children in the proposed move; that she failed in that burden; that the children enjoyed a strong connection to their father, their extended family, and to northwest Arkansas; and that they had spent extensive amounts of time with their father since the divorce. The chancellor determined that neither party had improper motives for their respective requests and that Sheree would likely comply with any modified visitation orders, but the children's best interests would not be served by permitting Sheree to relocate with them. This appeal followed.

Although the chancellor considered to some extent the factors articulated in *Staab v. Hurst*, 44 Ark. App. 128, 868 S.W.2d 517 (1994), her decision was clearly based on the finding that appellant, Sheree Hollandsworth, failed to meet the threshold burden of proving a real advantage to both the children and herself in the move. In reaching this conclusion, the chancellor relied heavily on this court's holding in *Hickmon v. Hickmon*, 70 Ark. App. 438, 19 S.W.3d 624 (2000). However, the chancellor erred as a matter of law in holding that Sheree must, as a threshold matter, prove a real advantage specific to the children in the proposed move, and erred in interpreting *Hickmon* to require such proof. *See Haas v. Haas*, 74 Ark. App. 49, 44 S.W.3d 773 (2001) (reversing chancellor who indicated that custodial parent was required to show advantage unique to minor child). *Hickmon* held that a cus-

todial parent seeking to relocate with the parties' minor children must first meet the burden of demonstrating some real advantage to the children and himself or herself from the move. *Hickmon*, 70 Ark. App. at 445, 19 S.W.3d at 629. Because the factual concerns of visitation with the father and extended family were similar to the facts in *Hickmon*, the chancellor stated that she "felt compelled" to deny the mother's request to relocate. Yet, we upheld the chancellor in *Hickmon* primarily on the basis that the psychologists who testified were united in their opinions that the move would have a detrimental psychological effect on the children. *Hickmon*, 70 Ark. App. at 446, 19 S.W.3d at 629-30; *see also Parker v. Parker*, 75 Ark. App. 90, 55 S.W.3d 773 (2001). The record in this case contains no evidence that the move would be psychologically detrimental to the children, and a correct analysis of the *Staab* factors favors granting the petition to relocate.

■ In *Staab v. Hurst*, 44 Ark. App. 128, 133-35, 868 S.W.2d 517, 519-20 (1994), we articulated a framework by which courts should be guided in deciding relocation disputes. We said therein that achieving the "best interests of the child" remains the ultimate objective in resolving all child custody and related matters, and we adopted the rationale announced in *D'Onofrio v. D'Onofrio*, 144 N.J.Super. 200, 365 A.2d 27, *aff'd* 144 N.J.Super. 352, 365 A.2d 716 (App. Div. 1976). *D'Onofrio* provided that, where the custodial parent seeks to move with the parties' children to a place so geographically distant as to render weekly visitation impossible or impractical, and where the noncustodial parent objects to the move, the custodial parent should have the burden of first demonstrating that some real advantage will result to the new family unit from the move. The *D'Onofrio* opinion explained:

> Where the residence of the new family unit and that of the noncustodial parent are geographically close, some variation of visitation on a weekly basis is traditionally viewed as being most consistent with maintaining the parental relationship, and where, as here, that has been the visitation pattern, a court should be loath to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons.

*D'Onofrio*, 365 A.2d at 30.

■ D'Onofrio further provided that, where the custodial parent meets this threshold burden, the court should then consider a number of factors in order to accommodate the compelling interests of all the family members. These factors should include: (1) the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children; (2) the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the noncustodial parent; (3) whether the custodial parent is likely to comply with substitute visitation orders; (4) the integrity of the noncustodial parent's motives in resisting the removal; (5) whether, if removal is allowed, there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parent relationship with the noncustodial parent.

■ We hold that the chancellor erred in finding that a real advantage to the new family unit of Sheree and the children was not proven in this case. The evidence demonstrated that Sheree will benefit by living with her husband and the father of her expected child. The children will benefit from living in a two-parent household with their half-sibling. The family will benefit from the financial advantages of Brian's career, which includes the benefit of allowing Sheree the opportunity to be a stay-at-home mother. These advantages are not insignificant, and they benefit the members of the family both individually and collectively.

■ We have previously held that both compelling job opportunities or the chance to finish an education provide a real advantage to the children and custodial parent. *See Wagner v. Wagner*, 74 Ark. App. 135, 45 S.W.3d 852 (2001); *Hass v. Hass*, 74 Ark. App. 49, 44 S.W.3d 773 (2001). The choice and opportunity to be a stay-at-home parent can be a compelling job opportunity providing a real advantage to the children. Our precedent also clearly acknowledges that "psychological and emotional aspects of relocation can be as advantageous as economic or educational aspects." *Parker v. Parker*, 75 Ark. App. 90, 99, 55 S.W.3d 773, 779 (2001).

■ The chancellor's findings reflect that the *Staab* factors weighed in favor of granting Sheree's petition. In *Staab*:

> We reversed the chancellor's ruling and recognized that, while the best interests of the children remain the ultimate objective in resolving all child custody and related matters, the standard must be more specific and instructive to address parental relocation disputes. Determination of a child's best interests cannot be made in a vacuum, we said, but requires that the interests of the custodial parent be taken into account as well. We further acknowledged that, following a divorce, children belong to a different family unit than they did when their parents lived together. The new family unit consists of the children and the custodial parent, and what is advantageous to the unit's members as a whole, to each of its members individually, and to the way they relate to each other and function together is in the best interests of the children.

*Parker*, 75 Ark. App. at 98, 55 S.W.3d at 779.

■ In applying the *Staab* analysis, the chancellor specifically stated, "[t]he prospective advantages, I do think that Corporal Hollandsworth is a good influence in the lives of the children and in the life of Mrs. [Hollandsworth]. I think there is no doubt [Corporal Hollandsworth] will be a good provider. I have no question about that." Moreover, she stated that, "Whether or not Sheree would comply with substitute visitation orders, I don't have any doubt that she would. I believe that she would comply with whatever order the Court set out for her, that she would absolutely get the children to and from each visitation. I don't think there is any improper motive by either of the parties." Thus, when weighing the *Staab* factors, the chancellor clearly found that there was some benefit to the move. Even slight differences that are important to the custodial parent that offer distinct personal appeal may be significant enough to support a move. *See Parker, supra.*

■ Based on our *de novo* review of the facts in this case, we hold that the chancellor clearly erred in denying Sheree's petition to relocate and in granting Keith's petition to change custody. Thus, we reverse and remand with instructions to enter an order consistent with this opinion.

Reversed and remanded.

PITTMAN, J., concurs; BIRD, J., concurs separately; GRIFFEN and VAUGHT, JJ., agree.

STROUD, C.J., ROBBINS, CRABTREE, and ROAF, JJ., dissent.

JOHN MAUZY PITTMAN, Judge, concurring. I agree with the result obtained in the prevailing opinion in this case. I also agree with Judge Bird's concurring view that our decision in *Hickmon v. Hickmon*, 70 Ark. App. 438, 19 S.W.3d 624 (2000), was incorrectly decided and should be overruled. I write separately only to address misconceptions concerning our holding in *Staab v. Hurst*, 44 Ark. App. 128, 868 S.W.2d 517 (1994).

*Staab* holds that, where the custodial parent seeks to relocate with the parties' children to a place so geographically distant as to render weekly visitation impossible or impractical, and where the noncustodial parent objects to the move, the custodial parent has the burden of first demonstrating that some real advantage will result to the new family unit from the move. Where the custodial parent meets this threshold burden, the court should then consider a number of factors in order to accommodate the compelling interests of all the family members, including (1) the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children; (2) the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the noncustodial parent; (3) whether the custodial parent is likely to comply with substitute visitation orders; (4) the integrity of the noncustodial parent's motives in resisting the removal; and (5) whether, if removal is allowed, there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parent relationship with the noncustodial parent. *Id.* at 134, 868 S.W.2d at 520.

Judge Bird's concurring opinion notes that the New Jersey caselaw that we found persuasive in *Staab* was subsequently modified by the New Jersey Supreme Court. This is interesting, as a matter of historical fact, but has no significance to our analysis. In

*Staab*, we did not adopt New Jersey's law of child custody, but were merely persuaded by the rationale applied in a single case from that jurisdiction. We still find that rationale to be sound.

Judge Bird also argues in favor of a presumption in favor of parental location, and asserts that *Staab* was a departure from prior Arkansas law upholding such a presumption. This is simply wrong. By its terms, *Staab* is limited to cases where the planned relocation is to a place so geographically distant as to render weekly visitation impossible or impractical. In contrast, the case cited by Judge Bird for the supposed "relocation presumption" in Arkansas law did not involve such circumstances. To the contrary, the supreme court in *Ising v. Ward*, 231 Ark. 767, 332 S.W.2d 495 (1960), specifically noted that:

> In our earlier cases the objection to an application of this kind has usually sprung from the loss of visitation rights that the protesting parent would suffer upon the child's departure. That point is not involved here, for the proposed home in Oklahoma is not so far from Fort Smith as to interfere with the appellee's decreed right to have his daughter with him every other week end.

*Id.* at 768, 332 S.W.2d at 496.[1]

---

[1] Nor do the cases cited in *Ising* establish the supposed presumption in favor of permitting relocation. At best, these cases can be seen as standing for the proposition that permitting a custodial parent to move to another state "would not be beyond the power of the court." *Thompson v. Thompson*, 213 Ark. 595, 599, 212 S.W.2d 8, 10 (1948); *see also Antonacci v. Antonacci*, 222 Ark. 881, 263 S.W.2d 484 (1954), from which Judge Bird's reference to custodial parents as "prisoners" in Arkansas is presumably drawn, but which in *Antonacci* was in reference to a unique circumstance in which the custodial parent had actually established a home in California following the divorce without objection; had employment in California; but briefly returned to Arkansas, whereupon a proceeding for change of custody was instituted and she was restrained from returning with the child to their established home in California. The *Antonacci* court affirmed the trial court's order permitting her to return to California with the child in an opinion that makes no reference to any supposed presumption in favor of relocation, and that is wholly consistent with the principles enunciated in *Staab*. The remaining cases cited in *Ising, Nutt v. Nutt*, 214 Ark. 24, 214 S.W.2d 366 (1948), and *Langston v. Horton*, 229 Ark. 708, 317 S.W.2d 821 (1958), are squarely based on the long-abandoned "tender years" doctrine, a presumption that custody of young children should almost invariably be vested in the mother; *e.g.,* "In view of the tender years of the child, we think the custody should be awarded to the mother," *Nutt,* 214 Ark. at 33, 214 S.W.2d at 371; *compare Langston,* 229 Ark. at 710, 317 S.W.2d at 822, where the court opined that "the children should be placed in their mother's care rather than remaining in a home where there is no woman to look after their needs."

Perhaps the most fundamental misconception concerning *Staab* is the notion that it was intended to make parental relocation more difficult than had previously been the case. In fact, *Staab* was intended simply to regularize the law of parental relocation and render it less arbitrary. Prior to *Staab*, we had been presented with relocation cases demonstrating that some chancellors were unshakably opposed to permitting relocation and would deny virtually every request to do so that came before them. Given the enormous degree of deference that is rightly afforded to chancellor's decisions in cases involving child custody and the absence of any established framework for analyzing the often-competing considerations involved in relocation cases, we often found these cases to be especially difficult to resolve on a reasoned basis. *Staab* was intended to do no more than provide the framework for analysis that was previously lacking.

It has been rightly said that rules involving mechanical tests and modes of analysis are particularly ill-suited to cases involving child custody. *Riddle v. Riddle*, 28 Ark. App. 344, 775 S.W.2d 513 (1989). In the final analysis, all considerations must yield to the overriding concern for the best interest of the child that is the fundamental concern of the law of child custody, *see id.*, and any test or list of factors enunciated with respect to this law should be . seen simply as flexible devices intended to aid the court in determining what the best interest of the child may be. In this context, I believe that it is regrettable some Arkansas jurists have tended to overemphasize *Staab*'s requirement that the parent desiring to relocate to a distant site must meet the preliminary burden of showing a real advantage to the new family unit.[2] To my mind, this is a minimal burden to show an advantage that, although real, need not be measurable and that may embrace the entire realm of human activity. Economic, social, spiritual, even aesthetic factors may provide a real advantage. Nor need that advantage be exclusively, or even primarily, extended to the child, or to the custodial parent, or to any other member of the new family unit. A rising tide lifts all boats, and an advantage to one member of the new

---

[2] *See, e.g., Hickmon v. Hickmon*, 70 Ark. App. 438, 19 S.W.3d 624 (2000), and the trial courts' decisions in *Parker v. Parker*, 75 Ark. App. 90, 55 S.W.3d 773 (2001), and in *Hass v. Hass*, 74 Ark. App. 49, 44 S.W.3d 773 (2001).

family unit may indeed benefit, albeit indirectly, the entire family. It should be emphasized, too, that the list of factors enunciated in *Staab* is merely a framework for analysis, not a multi-part test consisting of elements that must all be satisfied or that are entitled to equal weight. Nor are the factors listed in *Staab* exclusive; in any individual case there may be other factors that also merit consideration. For example, in the case of a child suffering from a serious medical condition, ready access to appropriate health care facilities may be an overriding concern. Used properly, the framework enunciated in *Staab* provides a convenient starting point for analysis while retaining all the flexibility necessary to ensure that the best interests of the child are identified and protected in these difficult cases.

S AM BIRD, Judge, concurring. I agree with the majority that the chancellor's denial of appellant's petition to relocate with her children to Tennessee and the change of custody of the children to the appellee should be reversed. I also agree generally with much of the rationale expressed in the majority opinion and the concurring opinion of Judge Griffen. However, I write separately because I would go further and modify our decision in *Staab v. Hurst*, 44 Ark. App.128, 868 S.W.2d 517 (1994), and I would overrule, rather than attempt to distinguish, this court's decision in *Hickmon v. Hickmon*, 70 Ark. App. 438, 19 S.W.3d 624 (2000). *Hickmon*, a case that was neither reheard by this court nor reviewed by our supreme court, is inconsistent with our established precedent, and our established precedent itself merits revisiting, as the law in this area has not and cannot remain static; yet, this court has chosen to apply a rationale that has clearly not adequately achieved its purpose throughout the nation. Our precedent has essentially placed custodial parents in the untenable position of being prisoners in the State of Arkansas due to the unfortunate circumstances of a divorce, and the situation has worsened as a result of the misapplication of our precedent in *Hickmon*.

### *Analysis of* Staab v. Hurst

In 1994, this court, in deciding *Staab v. Hurst, supra,* adopted the criteria set forth in *D'Onofrio v. D'Onofrio*, 365 A.2d 27, *aff'd,* 365 A.2d 716 (N.J. Super. Ct. App. Div. 1976), as the criteria to

be applied in Arkansas in determining whether the custodial parent should be permitted to relocate with the children to a place so geographically distant that weekly visitation with the noncustodial parent is not practical. In *D'Onofrio*, the New Jersey court noted that after parents divorce, their children belong to a different family unit consisting only of the children and the custodial parent, and that what is advantageous to this new family unit as a whole, to each of its members individually and the way they relate to each other and function together, is obviously in the best interests of the children. Consequently, the criteria promulgated by the New Jersey court in *D'Onofrio*, and adopted by this court in *Staab*, allowed for consideration of more than just the children's best interests in deciding whether to permit a custodial parent to relocate. In recognition of the fact that "the day-to-day routine of the children, especially young ones, and the quality of their environment and their general style of life are that which are provided by the custodial parent," the *D'Onofrio* court allowed for consideration of the interests of the custodial parent along with the interests of the children that made up the new family unit. *Id.* at 29.

The *D'Onofrio* court concluded, and this court in *Staab* found the *D'Onofrio* conclusions to be sound, that in cases where the custodial parent can initially demonstrate that a "real advantage" to herself or himself and the children will result from their relocation to a distant place, referred to in *Staab*, *supra*, as the custodial parent's "threshold burden," then the court must consider the following factors in order to accommodate the compelling interests of all of the family members: (1) the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children; (2) the integrity of the custodial parent's motives in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the noncustodial parent; (3) whether the custodial parent is likely to comply with substitute visitation orders; (4) the integrity of the noncustodial parent's motives in resisting the removal; and (5) whether, if the removal is allowed, there will be a realistic opportunity for visitation in lieu of the weekly pattern that can provide

an adequate basis for preserving and fostering the parent relationship with the noncustodial parent. *D'Onofrio*, 365 A.2d at 30.

Although our opinion in *Staab* cited *Cooper v. Cooper*, 491 A.2d 606 (N.J. 1984), as being in accord with the *D'Onofrio* decision, the *Staab* opinion does not mention that in *Cooper*, the New Jersey Supreme Court, while recognizing *D'Onofrio* as the leading case in the area of parental relocation, modified *D'Onofrio*'s requisite "threshold burden" of the custodial parent, holding that "to establish sufficient cause for removal, the custodial parent initially must show that there is a real advantage to that parent in the move and that the move is not inimical to the best interests of the children." *Cooper*, 491 A.2d at 613. Thus, while the custodial parent's threshold burden in *D'Onofrio* was to demonstrate a "real advantage to *herself and the children*," under *Cooper*, the threshold burden is met by merely demonstrating a "real advantage to the *parent and that the move is not inimical to the best interests of the children*," a significant modification ignored by the *Staab* court, even though *Cooper* preceded our *Staab* decision by ten years. *Id*. The "real advantage" contemplated by the *Cooper* court "need not be a substantial advantage but one based on a sincere and genuine desire of the custodial parent to move and a sensible good faith reason for the move." *Id*. Addressing the inquiry into the effect on the child, the court stated that "[t]o establish that the move is not inimical to the best interests of the children, the moving party must show that no detriment to the children will result from the move." *Id*. The *Cooper* court merged the five *D'Onofrio* criteria that we adopted in *Staab* into three inquiries: (1) the prospective advantages of the move, including its capacity for maintaining or improving the general quality of life of both the custodial parent and the children; (2) the integrity of the custodial parent's motives in seeking to move, as well as the noncustodial parent's motives in seeking to restrain the move; (3) whether a realistic and reasonable visitation schedule can be reached if the move is allowed. *Id*.

The New Jersey Supreme Court addressed the parental relocation yet again in *Holder v. Polanski*, 544 A.2d 852 (N.J. 1988). Adopting almost a presumption of entitlement to relocation, the *Holder* court rejected its former requirement of a "real advantage" to the parent, and held that "any sincere, good-faith reason will

suffice" and that a custodial parent may move with the children "as long as the move does not interfere with the best interests of the children or the visitation rights of the non-custodial parent." *Id.* at 855-56. Though still recognizing the importance of the quality of the noncustodial parent's visitation, the court instructed that the important inquiry "should not be on whether the children or the custodial parent will benefit from the move, but on whether the children will suffer from it. Motives are relevant, but if the custodial parent is acting in good faith and not to frustrate the noncustodial parent's visitation rights, that should suffice." *Id.* at 857. The court further opined that "[s]hort of an adverse effect on the noncustodial parent's visitation rights or other aspects of the child's best interests, the custodial parent should enjoy the same freedom of movement as the noncustodial parent." *Id.* at 856. Recognizing that potential adverse effects on visitation could in some circumstances be adequately mitigated, the court stated that "[m]aintenance of a reasonable visitation schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of the custodial parent to move." *Id.* at 857. These substantial modifications by the *Holder* court, though occurring six years prior to *Staab*, were not addressed or acknowledged by the *Staab* court.

Finally, in 2001, the New Jersey Supreme Court again visited this issue, further defining its *Holder* decision in *Baures v. Lewis*, 770 A.2d 214 (N.J. 2001). After setting forth an extensive list of criteria that the trial court should consider in determining good faith and whether the move would be detrimental to the child's best interests, the *Baures* court emphasized that a mere change, even a reduction, in the noncustodial parent's visitation is not an independent basis on which to deny the removal. The *Baures* court recognized that under *Holder*, "it is not any effect on visitation, but an adverse effect that is pivotal. An adverse effect is not a mere change or even a lessening of visitation, it is a change in visitation that will not allow the non-custodial parent to maintain his or her relationship with the child." *Id.* at 227. A mere change, even a reduction, in the noncustodial parent's visitation is not an

independent basis on which to deny removal, the *Baures* court opined, rather:

> [i]t is one important consideration relevant to the question of whether a child's interest will be impaired, although not the only one. It is not the alteration in the visitation schedule that is the focus of the inquiry. Indeed alterations in the visitation scheme when one party moves are inevitable and acceptable. If that were not the case, removal could never occur and what *Cooper* and *Holder* attempted to achieve would be illusory.

*Id.* at 230. The court further held that it was the noncustodial parent's burden to produce evidence, "not just that the visitation will change, but that the change will negatively affect the child." *Id.* at 231.

Although our court adopted the *D'Onofrio* criteria in *Staab, supra*, we failed to acknowledge the substantial modifications that *D'Onofrio* had undergone by the New Jersey Supreme Court. This court acknowledged the relevance of *Cooper* in *Staab*, but failed to address the modifications of *Cooper* and *Holder*, and offered no explanation for rejecting the modifications in favor of the original *D'Onofrio* criteria. While this court is free to select all, some, or none of another jurisdiction's law, when we look to other jurisdictions, it is usually because the issue presented is one of first impression or one in which our courts have not fully developed the existing law. When *Staab* was decided in 1994, our supreme court had already addressed the issue of custodial parent relocation decades previously. *Ising v. Ward*, 231 Ark. 767, 332 S.W.2d 495 (1960). *Staab* gave passing credence to this supreme court guidance, noting that our supreme court had recognized in *Ising* that the custodial parent is "ordinarily entitled to move to another state and to take the child to the new domicile." *Staab*, 44 Ark. App. at 132, 868 S.W.2d at 519 (quoting *Ising*, 231 Ark. at 767, 332 S.W.2d at 495). While the *Staab* court determined that the standard "must be more specific and instructive to address relocation disputes," the court did not merely more clearly define the standard, the court changed the standard. *Id.* at 133, 868 S.W.2d at 519. No longer presuming that the custodial parent is entitled to relocate with the child as our supreme court had intimated, the *Staab* court instead chose to adopt the law of a New

Jersey lower court; law that had subsequently been modified by their supreme court in *Cooper* and *Holder*.

Thus, while acknowledging our supreme court's opinion that the custodial parent is ordinarily entitled to move and the court's disdain for imprisoning custodial parents in this state, the *Staab* court nevertheless adopted criteria that, even for the state that initially adopted the criteria, did not survive without substantial modification. The rationale of both the *Cooper* and the *Holder* court was available for review by this court when *Staab* was decided in 1994. I submit that this court erred in its adoption of the *D'Onofrio* threshold burden, and that the *Holder* burden more closely follows our supreme court's position.

Our society is developing at a greatly accelerated pace, and technology has advanced multiple fold since our supreme court last addressed the right of a custodial parent to relocate with the children. Despite the lack of our current technology and conveniences, such as e-mail, cellular phones, and affordable airfare, our supreme court in 1964 chose freedom for the custodial parent, even though such freedom may result in less contact between the noncustodial parent and the child. Certainly today, the burden to maintain visitation is greatly reduced, yet we have increased the burden that the custodial parent must meet in order to enjoy the same freedom of choice that the noncustodial parent takes for granted.

I advocate a return to the established law, before this court began down an erroneous path beginning with *Staab*, and hopefully ending with the modification of *Staab*, to allow for the adoption of a presumption in favor of the custodial parent's right to relocate with the children, absent a finding that such relocation would be detrimental to the child.

### Analysis of Hickmon

Unlike the majority and Judge Griffen, I believe that reversal of the case at bar would require the overruling of *Hickmon, supra*. The *Hickmon* court, in affirming the denial of the mother's relocation, stated that:

> Obviously, the move would have significant advantages for [the mother]; she would be with her husband and she would be away from her ex-husband, whom she perceives as an antagonist in her life. Although the evidence was somewhat sparse in this regard, she also would apparently be moving to a better-paying job, requiring fewer hours, and the flexibility to work at home. However, it is not apparent that there would be any "real advantage" for [the child].

*Id.* at 445, 19 S.W.3d at 629.

With *Staab*, this court adopted an erroneous approach to parental relocation issues; with *Hickmon*, this court further erred by misapplying the erroneous approach that it purports to utilize. The *Hickmon* court failed to follow the *Staab* instruction that "what is advantageous to [the new family unit] as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interest of the children." *Staab*, 44 Ark. App. at 127, 868 S.W.2d at 519. Without taking into account the effect that the advantages to the parent would have on the child, the *Hickmon* court failed to consider the advantages of the relocation to the new family unit as a whole; thus, erroneously looking for advantages specific only to the child, an erroneous application of an erroneous standard.

Adopting the rationale of *Cooper* and *Holder* would certainly necessitate the overruling of *Hickmon*, as the *Hickmon* court's decision to affirm the denial of the relocation petition based upon a failure to meet the threshold burden could not stand when the modified threshold burden is applied.

> Because the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account. . . . We do not . . . equate the best interests of the child with the best interests of the custodial parent. We do maintain, however, that a determination of the best interests of the child requires taking into account the interests of the custodial parent."

*Cooper*, 491 A.2d at 612. Not only was the *Cooper* burden of a real advantage to the parent clearly met in *Hickmon*, but most certainly the *Holder* burden of a sincere, good-faith reason was presented for

the move in *Hickmon*, the mother's remarriage and opportunity to spend more time at home with her child.

Whether the threshold burden of demonstrating a "real advantage" remains the law in the future, or whether the rationale advocated herein is adopted, no inquiry can be made in a vacuum. The custodial parent necessarily affects the well-being of the child; thus, it is unavoidable to conclude that the better the well-being of the custodial parent, the better the child's well-being is likely to be. Because the *Hickmon* decision is premised upon the failure to meet the *D'Onofrio* threshold burden, its overruling by the adoption of the *Holder* rationale and the return to rationale that is consistent with our supreme court's precedent is inescapable, and is not capable of distinguishment.

The supreme court has expressed its disdain for imprisoning custodial parents in the state of Arkansas. Yet, I recognize that each set of parents, each new family unit, and each new set of circumstances requires a fact-intensive inquiry and that there can be no black-letter rule in areas such as this. The trial judge is faced with balancing a custodial parent's freedom to relocate with the non-custodial parent's rights to visitation and maintenance of a meaningful relationship with the child. Recognizing a presumption in favor of the custodial parent's freedom to relocate will not give custodial parents unfettered permission to relocate, as the trial judge is still the gatekeeper and guardian of the well-being of the child, and relocation would not be allowed when the trial judge determines that the relocation would be detrimental to the child. A presumption is such because, in the usual course of events, a particular behavior, result, or event is the most probable, *ceteris paribus*, given a certain set of circumstances. *Hickmon* has been the only post-*Staab* case in which we affirmed a denial of a petition to relocate. Recognizing a presumption in favor of relocation merely recognizes the fact that, in the usual course of events, *ceteris paribus*, relocation is not detrimental to the child.

I agree that the case at bar must be reversed. Further, I advocate that this court modify the *Staab* relocation analysis to reflect the modifications pursuant to *Cooper*, *Holder*, and *Baures*, and adopt a presumption in favor of a custodial parent's right to relo-

cate with the child unless such relocation is found to be detrimental to the child.

VAUGHT and BAKER, JJ., join in this concurrence.

WENDELL L. GRIFFEN, Judge, concurring. I join Judges BAKER, PITTMAN, BIRD, and VAUGHT, in today's decision to reverse the trial judge's decision that denied appellant's request to relocate out-of-state with the children (Ethan Knyzewski and Katherine Knyzewski) from her previous marriage to appellee, and which changed custody of those children from her to her ex-husband. I join Judge Baker's opinion because I agree that the trial judge clearly erred when she denied appellant's relocation petition and ordered a change of custody based on what she deemed advantages to the children in reliance on the holding in *Hickmon v. Hickmon*, 70 Ark. App. 438, 19 S.W.3d 624 (2000). However, I write separately to express the following distinct concerns: (1) to the extent that the decision below relied upon *Hickmon*, the facts of this case are materially different; and (2) this case exposes deep flaws in the rationale underlying *Hickmon*. Those flaws show that our longstanding reliance on the "best interest of the child" standard for deciding child-custody disputes is being misapplied in disputes involving relocation petitions by custodial parents. Furthermore, the rationale advanced in the dissenting opinion reflects a biased perspective on relocation and child custody that unjustly penalizes custodial parents. Rather than extend *Hickmon* to this and future relocation controversies, I favor returning to the five factors for deciding relocation cases that our court announced in *Staab v. Hurst*, 44 Ark. App. 128, 868 S.W.2d 517 (1994).

Following a September 19, 2000 hearing, appellant and appellee were divorced pursuant to a decree entered on October 10, 2000. The divorce decree awarded appellant primary custody of Ethan and Katherine. Appellant began dating Brian Hollandsworth, a soldier in the United States Army whom she has known for several years. She married Hollandsworth on December 31, 2000, and thereafter informed appellee that she intended to relocate to Clarksville, Tennessee, to live with her new husband. On January 11, 2001, appellee filed a "Petition for Modification,"

which asserted that appellant's remarriage and announced intent to relocate Ethan and Katherine to Clarksville, Tennessee, would defeat his visitation schedule with the children and sever the ties the children had established in Northwest Arkansas so as to constitute a material and substantial change in circumstances warranting modification of the divorce decree insofar as child custody was concerned. The matter was heard by the trial judge on April 26, 2001, and the judge found that the appellant "failed to satisfy the burden of proof establishing that it would be in the best interests of the minor children for this Court to allow said minor children to be relocated to Clarksville, Tennessee." The trial judge primarily based her finding and decision on evidence that the children enjoyed a strong connection with their father (appellee) based on the time spent with him since the divorce as well as "the strong ties to the family and community enjoyed by said minor children in Northwest Arkansas."

### The Holding in Hickmon is Distinguishable

In this case, the trial judge emphasized the evidence regarding the strong connection Ethan and Katherine have with their father and their ties to other family and friends in Northwest Arkansas. In doing so, the judge signaled that her decision on appellee's petition for modification of the custody arrangement was based on the impact relocation would have on visitation by appellee and other relatives. The trial judge cited Hickmon as the basis for her decision.

However, Hickmon involved a very different set of facts from those found in this case. In Hickmon, the parent parties agreed to joint legal custody following their divorce, with the ex-wife appellant having primary physical custody of their seven-year-old daughter. The ex-husband appellee in Hickmon had extensive visitation pursuant to the agreement. However, the record contained clear evidence of disputes between the parents that impacted visitation and custody. The ex-wife appellant in Hickmon had a history of psychological illness which, although treated and improved, prompted one psychologist to opine that it "changed this whole situation a little bit" and "skewed a little bit more in the father's favor, in terms of maintaining that parental involvement."

*Hickmon*, 70 Ark. App. at 441, 19 S.W.3d at 627. Two psychologists testified that the relocation would mean the child's loss of contact with her father (the noncustodial parent), her home, pets, friends, and teacher. The *Hickmon* opinion also included one psychologist's opinion that the appellant-mother's desire to relocate was "in part inspired by her desire to get away from [her ex-husband] and noted that [the ex-wife appellant] expressed concern about [the child's] step-mother attempting to assume her role." Not only did that case involve evidence that the noncustodial parent was "highly involved" in the life of the minor child, "to her obvious advantage," but Judge Roaf's opinion contained the following concluding sentence: "Significantly, both experts opined that the move was not in Miranda's best interest." *Id.* at 446, 19 S.W.3d at 630.

None of those significant facts occurred in this case. Appellant was awarded primary legal custody of Ethan and Katherine in the divorce decree. She and appellee amicably agreed, however, to share joint physical custody whereby each had custody of both children half the time each week. Unlike the situation in *Hickmon*, the former spouses in this case maintained an amicable relationship even after appellant remarried. Appellant and appellee apparently convinced the trial judge that their amicable relationship was not a charade. The trial judge expressly declared that appellant's motives for wanting to relocate the children to Tennessee were pure and not an attempt to interfere with the relationship the children shared with their father. The trial judge also declared from the bench her conviction that appellant would comply with substitute visitation orders and "that she would absolutely get the children to and from each visitation." Unless one believes that the facts in *Hickmon* were immaterial to the outcome and rationale given for the holding in that case, I do not understand how *Hickmon* compels the result reached by the trial judge in this case.

The analysis I advance is not new. In *Parker v. Parker*, 75 Ark. App. 90, 55 S.W.3d 773 (2001), our court reversed a chancellor's decision that denied permission to a custodial ex-wife to relocate with her three children from Jonesboro to Little Rock, notwithstanding that the a temporary agreed order which awarded custody to the wife and provided that neither parent would remove the

children from Craighead County for five years from entry of a final divorce decree. Judge Vaught, writing for the majority in *Parker*, reviewed our appellate decisions following *Staab v. Hurst, supra*, and correctly observed that *Hickmon* was — at that time —

> [t]he only post-*Staab* decision in which we have upheld a chancellor's decision to deny permission to relocate. . . . We affirmed primarily on the basis that the psychologists who testified were united in their opinions that the move would inflict a loss on the child and would alienate the child from her father and all the family, friends, and pets that she loved. By contrast, there is no testimony in this case that the move would have such a detrimental psychological effect on the children.

*Parker*, 75 Ark. App. at 99-100, 55 S.W.3d at 780. Similar to *Parker*, this case contains no proof that the appellant's relocation to Clarksville, Tennessee will present the risk of the emotional injury to Ethan and or Katherine that was found controlling in *Hickmon*.

### The Rationale Upon Which Hickmon Rests is Flawed

Besides being so factually different as to be of dubious precedential value, this case exposes deep flaws in the underlying reasoning on which the *Hickmon* holding purports to stand. The *Hickmon* court concluded that our decision in *Staab v. Hurst, supra*, "did not abolish the best-interest-of-the-child standard in cases where a custodial parent wishes to move a child out of state." *Hickmon*, 70 Ark. App. at 444, 19 S.W.3d at 628. Rather, the *Hickmon* opinion asserts that in *Staab*, "this court merely provided more guidance for chancellors when they are confronted with this situation." *Id.*, 19 S.W.3d at 629. With no disrespect intended to the members of the current minority who also decided *Hickmon*, a fair reading of that opinion and the dissenting opinion in this case shows that what is supposed to be an inquiry into whether the proposed relocation presents some real advantage to the custodial parent and the children is often nothing more than an inquiry about whether the relocation poses an advantage to the children no matter what advantage it may present for the family unit as a whole (custodial parent and children). As such, *Hickmon* retreats from the *Staab v. Hurst* standard while purporting to honor it.

For example, the opinion in *Hickmon* quoted with apparent approval the comment in *Staab* that the pertinent standard "must be more specific and instructive to address relocation disputes."

*Hickmon*, 70 Ark. App. 444, 19 S.W.3d at 628. The *Hickmon* opinion also quoted the statement from *Staab* that "we think it important to note that determining a child's best interests in the context of a relocation dispute requires consideration of issues that are not necessarily the same as in custody cases or more ordinary visitation cases." *Id.*, 19 S.W.3d at 628-29. The *Hickmon* court also quoted with approval the requirement that before a trial judge considers the five relocation factors announced in *Staab*, "the custodial parent bears the threshold burden to prove some real advantage to the children and himself or herself in the move." *Id.* at 445, 19 S.W.3d at 629 (citing *Wilson v. Wilson*, 67 Ark. App. 48, 991 S.W.2d 647 (1999)).[1]

Despite reaching the consensus on *de novo* review that the proposed relocation "would have significant advantages" for the custodial parent, the outcome in *Hickmon* plainly turned on the conclusion that: "it . . . is not apparent that there would be any 'real advantage' to [the minor child]." *Hickmon*, 70 Ark. App. at 445, 19 S.W.3d at 629. That conclusion was reached based on the following reasoning:

> We cannot say that there is compelling evidence of improper motive on Sandra's [the custodial parent and *Hickmon* appellant] part in wanting to move, or Randy's [the *Hickmon* appellee] part in opposing it; that any visitation order would not be complied with; or that the visitation Sandra offered would not be substantial. *Nonetheless, we have before us a case in which Miranda's father is highly involved in her life, to her obvious advantage, and a paucity of evidence of any real advantage for Miranda in moving to Phoenix.* Significantly, both experts opined that the move was not in Miranda's best interest.

*Id.* at 446, 19 S.W.3d at 630 (emphasis added).

The trial judge in this case was greatly influenced by the foregoing reasoning from *Hickmon*, because both cases involved situations where the noncustodial parents were "highly involved" in the lives of the children. Several problems arise from this analysis, nonetheless.

---

[1] I consider this "threshold burden" merely duplicative of the first *Staab* factor, *i.e.*, "the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children." *See Staab, supra.*

First, this reasoning implies that custodial parents bear a greater burden of proving that relocation outside the state presents an advantage to them and their children when the non-custodial parents are "highly involved" with the children. On its face, the fairness of that proposition seems self-evident. Serious questions arise, however, when one ponders the matter more deeply. Does this mean that the freedom of custodial parents to relocate depends on how involved noncustodial parents are despite proof that visitation will not be materially compromised and even when custodial parents prove that relocation will be advantageous for them and the children? Apparently so, because *Hickmon* and the present case include express findings by the trial judges that the custodial parents would comply with visitation orders. The *Hickmon* court refused to conclude that the custodial parent would offer anything other than substantial visitation; it also found no improper motive on her part in seeking to relocate. Thus, one wonders how custodial parents who successfully prove that relocation will not involve a substantial deprivation of the visitation rights exercised by non-custodial parents will ever meet the burden of proving that relocation will benefit *them and their children* when the noncustodial parents are deemed "highly involved" with the children. One also wonders why the fact that "highly involved" custodial parents who relocate will necessarily be less involved due to loss of custody is not viewed at least as detrimental to the children as would be the supposed loss of involvement by noncustodial parents posed by relocation.

This is not merely a hypertechnical concern. As previously stated, current law obligates the custodial parent to prove that relocation poses a real advantage to the children and the custodial parent. If the advantage demonstrated by such proof is nullified, if not trumped altogether, by proof that the noncustodial parent is "highly involved" in the lives of the children, then the inquiry actually turns on whether relocation poses an advantage to the children *and the non-custodial parent.*

Outside the visitation context, custodial parents have no control over how much noncustodial parents are involved with their children. Even within the context of visitation, custodial parents cannot control the involvement of noncustodial parents aside from ensuring that the child is available. This is true even when both parents live in the same community. To impose such an eviden-

tiary burden on custodial parents who want to relocate to another state is unrealistic, to put it mildly.

Yet, this is but one flaw in the *Hickmon* rationale exposed by this case. Another involves the effect of *Hickmon* on custodial parents who want to remarry, retain custody of their children, and live outside Arkansas. In *Hickmon*, the custodial parent who remarried lost custody of her child, *despite declaring that she would not relocate if it meant she would lose custody.* Her petition for permission to relocate was denied and she lost custody, to boot. In this case, appellant remarried and forthrightly declared that she would relocate even if it meant losing custody. Despite concluding that appellant's relocation presented a benefit to herself and the two children of her marriage to appellee was not an attempt to interfere with the relationship of Ethan and Katherine with appellee, and that appellant would comply with substitute visitation orders, the trial judge denied the relocation petition and the custody arrangement.

One would ordinarily think that courts encourage marriage. After all, judges and other officiants at marriage ceremonies profess that marriage is an honorable estate. I know of no caveat that holds remarriage to be less honorable or less worthy of affirmation. Furthermore, our courts have affirmed decisions to change custody in numerous cases upon proof of cohabitation by a custodial parent with another person without marriage while children of a former marriage are present. *See Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999); *Walker v. Walker*, 262 Ark. 648, 559 S.W.2d 716 (1978); *Ketron v. Ketron*, 15 Ark. App. 325, 692 S.W.2d 261 (1985). So it is more than a little strange that the law would essentially penalize a custodial parent who takes the honorable step of marriage following divorce if remarriage carries the prospect of life outside Arkansas.

The dissenting opinion and the *Hickmon* rationale on which it stands would produce a bizarre scenario. Formerly married custodial parents risk losing custody of their children if they cohabit without the benefit of marriage, whether in Arkansas or elsewhere. Formerly unmarried noncustodial parents risk nothing if they cohabit without marriage. If a custodial parent marries someone from another state and seeks permission to relocate with the children, under the dissenting judges' reasoning the custodial

parent would risk loss of custody even when relocation poses no substantial interference with visitation rights exercised by the non-custodial parent when the court determines that the noncustodial parent is "highly involved" with the children. If a noncustodial parent is "highly involved" with a child, but becomes less involved for whatever reasons, neither the holding in *Hickmon* nor the position advocated by our dissenting colleagues in this case suggest that the reduced involvement will constitute a material change of circumstance sufficient to restore the pre-relocation custody arrangement. One can easily conceive of situations where non-custodial parents remarry and remain "highly involved" with their children with the effect of including their new spouses with that involvement. Presumably, we would view the involvement by spouses of noncustodial parents to be advantageous to the children. Yet, "highly involved" custodial parents would never be able to even attempt comparable involvement of a subsequent spouse upon remarriage to a person living outside Arkansas if the position asserted by appellee and the decision of the trail court is upheld.

Beyond that, a noncustodial parent can relocate at will — without leave from or even providing notice to any court — no matter what impact relocation may have on the children or the ability of the custodial parent to fulfill parenting functions. Had the appellee in this case decided to remarry and move to Kentucky, for example, nothing in *Hickmon* or the dissenting opinion today suggests that appellant would have a right to oppose the relocation or otherwise object to it. No matter how that relocation might affect Ethan and Katherine emotionally, socially, or otherwise, no one suggests that appellant is entitled to seek a decree ordering her former husband to remain in Arkansas to continue his relationship with Ethan and Katherine, let alone make sure that the children interact with their grandparents on either side of the family. A rule of law that effectively requires custodial parents to gamble custody of their children before they can live with their children and new spouses outside Arkansas — while imposing no similar limitations on noncustodial parents who profess to be "highly involved" in the lives of their children — seems the very antithesis of domestic stability. It is also grossly unfair.

Judging from *Hickmon* and the dissenting opinion today, the fact that this disquieting inconsistency disproportionately affects women more than men seems irrelevant. In *Parker v. Parker, supra,*

Judge Vaught observed that we have approved parental relocations in four published cases applying the *Staab* factors. I find it more than coincidental that in each of those cases, the custodial parent seeking relocation was the mother. In *Wilson v. Wilson, supra*, we affirmed the chancellor's decision to allow relocation to California because the custodial parent felt she could find employment there. In *Friedrich v. Bevis*, 69 Ark. App. 56, 9 S.W.3d 556 (2000), we affirmed a chancellor's decision to allow a relocation to Texas because the custodial parent had obtained a better-paying job with less travel. In *Wagner v. Wagner*, 74 Ark. App. 135, 45 S.W.3d 852 (2001), we affirmed a chancellor's decision to allow relocation to Florida because the custodial parent had a job opportunity there and would be near her mother. In *Hass v. Hass*, 74 Ark. App. 49, 44 S.W.3d 773 (2001), an intrastate relocation case like *Parker*, we reversed the chancellor's decision to prohibit the custodial mother from moving to El Dorado from Fayetteville to accept better employment. In *Gerot v. Gerot*, 76 Ark. App. 138, 61 S.W.3d 890 (2002), we reversed a chancellor's decision changing custody to the noncustodial father because there was neither allegation nor proof of a material change of circumstances. We remanded the case to the chancellor for reconsideration of the appellant and custodial mother's petition to relocate to Florida where she had obtained more attractive employment.

Our society has long practiced a double standard regarding social freedom and gender. That men can be custodial parents and, as such, would be bound by the *Hickmon* rationale is merely a truism. The more relevant truth is that men are unentitled beneficiaries of greater social, economic, and cultural freedom than women who, for reasons largely due to gender, labor under greater social, economic, and cultural burdens when they try to exercise freedoms men often take for granted. Men are less likely to encounter social ostracism than women after divorce, no matter the reason for the divorce. They are less prone to encounter discrimination on account of their gender in the workplace, whether they are custodial parents or not. In Arkansas and elsewhere throughout American society, men earn decisively more money than women, even when performing the same work. Thus, the social, economic, and cultural forces that might influence a divorced woman to relocate to another state usually will not affect men the same way.

More women are pursuing job opportunities outside Arkansas, whether they remarry or not. With per capita income being higher and job prospects often more attractive in other states than in Arkansas, continued adherence to the *Hickmon* holding will mean even more difficult times for formerly married women striving to raise their children and themselves through higher pay and life in more socially-progressive settings. Although I do not suggest that the decision in *Hickmon* reflects gender bias on our court, I cannot ignore the gender-specific consequences it portends. Even when relocation and remarriage mean a custodial parent will be able to spend more time with the children and provide other advantages — as shown by this case — the result today and in *Hickmon* show that custodial parents — women in many instances — face an onerous task in convincing judges that relocation is advantageous for them and their children where the children are "highly involved" with noncustodial parents.

### *The* Staab v. Hurst *Remedy*

I believe that we can reverse the trial judge without disturbing *Hickmon*. As stated before, the facts in *Hickmon* regarding the expert opinion testimony about the perceived negative impact that relocation would have on the emotional welfare of the child are factually distinguishable from this case. We distinguished *Hickmon* on that basis when we reversed a chancellor's decision to deny intrastate relocation in *Parker*. I see no reason not to do so now.

On the other hand, the decision below in this case shows that the holding and rationale in *Hickmon* create more problems than they purport to solve. Whatever else may be disputed, it is unmistakably clear that the trial judge in this case felt bound by *Hickmon* to deny appellant's relocation petition. Rather than decide whether relocation posed a real advantage to the family unit consisting of the custodial parent and the children, the judge focused on whether relocation was advantageous to the children in view of the fact that the noncustodial parent was "highly involved" with them.

The remedy for this mis-analysis lies in basing relocation decisions on the five-fold test prescribed by *Staab v. Hurst*, 44 Ark. App. at 134, 868 S.W.2d at 520. These factors are as follows:

(1) the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for *both the custodial parent and the children*; (2) the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the non-custodial parent; (3) whether the custodial parent is likely to comply with substitute visitation orders; (4) the integrity of the non-custodial parent's motives in resisting the removal; and (5) whether, if removal is allowed, there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parent relationship with the non-custodial parent.

(Emphasis added.) These factors accomplish the valid purposes of considering whether the relocation presents a real advantage to the custodial parent and the children while also considering the effect of removal on the opportunity for visitation by the noncustodial parent.

When I analyze this case in view of the *Staab* factors, I have no difficulty agreeing that we should reverse the trial judge's denial of appellant's relocation petition and the decision to change custody to appellee. The trial judge was unequivocal during her bench ruling: she did not doubt that appellant would comply with substitute visitation orders and "that she would absolutely get the children to and from each visitation." However, the trial judge decided that there "was not a way to substitute the long distance visitation for what the children have been used to with their father. . . These children are used to being with their dad three and a half days a week and with their mom three and a half days a week. They are used to seeing grandparents very regularly in their home every week on a weekly base [*sic*]. There are maternal grandparents here as well . . ."

The trial judge correctly observed that appellee and appellant equally divided the time that the children spent in their respective homes. However, that arrangement reflected an agreement that was likely to change even had appellant not remarried and decided to move to Tennessee to live with her new spouse. At the hearing, Ethan, the older child, was due to enter kindergarten soon. By now, Katherine is kindergarten age. Appellant lived in Fayetteville, appellee lived in Rogers. While it may be pleasant to

imagine that the equal time arrangement would continue once Ethan began school, that assumption is unrealistic.

Furthermore, our decision in *Parker, supra,* shows that even when the parties have entered into a formal and court-approved agreement providing against relocation, their agreement is "nothing more than an indicator that, at some point, appellant and appellee shared the attitude that the children should not be moved." *Parker,* 75 Ark. App. at 100, 55 S.W.3d at 780. If the court-approved agreement in *Parker* did not trump proof that the appellant's relocation presented a real advantage to herself and her children and otherwise was consistent with the *Staab* factors, I see no reason why the parties' arrangement in this case should do so. Given the trial judge's conclusion that appellant would comply with substitute visitation orders and that the relocation was not based on a desire to interfere with the relationship the children had with appellee, I must conclude that the judge's decision was clearly erroneous.

My view is further strengthened by the fact that appellant now has a third child, born from her union with her current spouse. The trial judge's decision not only severed the family unit consisting of appellant, Ethan, and Katherine. It effectively precluded appellant's third child from joining that family unit. I see no value whatsoever in preventing appellant, Ethan, and Katherine from establishing and nurturing appellant's third child — the half-sibling of Ethan and Katherine — as part of their family unit consistent with the first factor in *Staab v. Hurst.* I certainly see a detriment to that family unit by the effect of the trial judge's decision denying relocation.

Finally, I join the decision to reverse the trial judge's decision to change custody to appellee. It is established law that the party seeking modification of a previous child custody order has the burden below to show a material change of circumstances sufficient to warrant a change of custody. *See Gerot v. Gerot, supra; see also Hollinger v. Hollinger,* 65 Ark. App. 110, 986 S.W.2d 105 (1999). While custody is always modifiable, our courts require a more rigid standard for modification than for initial determinations in order to promote stability and continuity for the children and to discourage repeated litigation of the same issues. *See Stellpflug v. Stellpflug,* 70 Ark. App. 88, 14 S.W.3d 536 (2000). Appel-

lant's relocation to Tennessee and remarriage are not, considering the other proof, material circumstances affecting the welfare of the children so as to warrant a change of custody to appellee.

JOHN B. ROBBINS, Judge, dissenting. I cannot agree to reverse the decision of the chancellor in this case. Moreover, I cannot ignore the fact that, of the five-judge majority, four issued opinions to express their distinctly different views. There should be a clearly stated consensus by those who would reverse a chancellor's decision in a case bearing on the lives of children, to whom custody will be vested, and the myriad of persons affected by this decision. While we perform a de novo review of the record, we are obligated to give substantial deference to the chancellor's superior position to evaluate the evidence and the witnesses in these fact-intensive inquiries. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake was committed. *See Wagner v. Wagner*, 74 Ark. App. 135, 45 S.W.3d 852 (2001). I am not left with such a conviction.

The majority fairly expresses some basic facts relevant to this appeal, but more are necessary for our de novo review. Sheree's parents, Keith and his parents, and several of their respective relatives lived in and around northwest Arkansas. Sheree had no relatives in Tennessee, other than her new husband, whose military career required that he be away from home much of the time. Sheree planned to join her new husband at his military base, Fort Campbell, in Clarksville, Tennessee, regardless of the chancellor's decision. Though Sheree was staying with her parents pending the litigation, she and her husband had already set up a household in Tennessee. Sheree had worked as a waitress in northwest Arkansas and stated that she intended to work parttime as a waitress after moving to Tennessee. In fact, she already had a job "lined up" in Tennessee prior to the litigation ensuing, and the only reason she had not commenced her waitress job there was because she had stayed in Arkansas pending these proceedings. Her testimony reflects that there would be some period of time wherein she could rely solely on her new husband's income before her re-employment, but she was planning on putting the children in a day-care setting. She candidly admitted that she could not

articulate any advantages specific to the town of Clarksville, Tennessee, over what the children enjoyed in northwest Arkansas, and the children had never been to Clarksville to date.

Keith planned to finish his degree at the university and make a down payment on a house in the near future, with assurances from his mother that she could help with the children. If Keith were permitted to have custody, the children had friends in the neighborhood, and Ethan's school that he would be attending for kindergarten was located at the end of the street. Keith testified that the move would be hard on the children because they had no family or friends in Tennessee other than Sheree and Bruce, and that the children's needs were paramount and would be better served in the home that they have had all their lives in northwest Arkansas.

The first finding made was that the initial burden to demonstrate some real advantage to Sheree and the children was not carried. I cannot say that this is clearly erroneous. Obviously the move holds significant advantages for Sheree because she will be living with her new husband, she plans to be a stay-at-home mother for a while, and she will enjoy housing and lesser overhead costs provided by her husband's career. However, it is not apparent that there would be any real advantage to the children. They would have substantially less contact with their highly involved father, extended relatives, and the familiar surroundings they have known all their lives. When this petition to relocate was filed, Sheree and her husband were adjusting to a new marriage of seventeen days and a new home, and Sheree was unaware that she would be expecting a child at that time. Sheree's husband would be absent a great deal of time due to his military obligation, and he had not spent much time with the children to date for this reason. The only real benefit to the established family unit as it stood (Sheree and the children) would be that it would remain intact, which would be true in every petition to relocate and cannot equate to meeting this threshold burden placed on the party seeking to relocate. I cannot say that the chancellor clearly erred in so finding.

The majority acknowledges our precedent in those cases in which we held that a "real advantage" would occur where the custodial parent trained to work in a certain career and has a com-

pelling job opportunity, *see e.g. Hass v. Hass*, 74 Ark. App. 49, 44 S.W.3d 773 (2001), or the chance to finish an education, *see Wagner v. Wagner*, 74 Ark. App. 135, 45 S.W.3d 852 (2001), or where there is generally less of an attachment with the noncustodial parent/relatives as compared with relatives where the move would take them. *See Wagner, supra.* However, no "real advantage" was found on facts similar to the present appeal in *Hickmon, supra.* The chancellor noted *Hickmon* when rendering her findings. I disagree that the chancellor was wrong to note the similarity of facts, as the majority holds. I also disagree that the present appeal is wholly distinguishable on the basis that psychologists testified that the move in *Hickmon* would have a detrimental psychological effect on the children.

> [W]here, as here, that has been the visitation pattern [weekly visitation], a court should be loathe to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons. . . . [Nevertheless,] the court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable lifestyle for the [custodial parent] and children be forfeited solely to maintain weekly visitation by the [non-custodial parent] where reasonable alternative visitation is available and where the advantages of the move are substantial.

*D'Onofrio v. D'Onofrio*, 144 N.J. Super. 200, 365 A.2d 27, 30 (App. Div. 1976).

We must give due deference to the superior position of the chancellor to view and judge the credibility of the witnesses. *Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997). Such deference to the chancellor is even greater in cases involving child custody, as a heavier burden is placed on the chancellor to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Anderson v. Anderson*, 18 Ark. App. 284, 715 S.W.2d 218 (1986). The chancellor herein did not clearly err, and we usurp the fact-finding function of the chancellor by holding otherwise in this case. I respectfully dissent.

I am authorized to state that STROUD, C.J., CRABTREE, and ROAF, JJ., join in this opinion.